WHEELER WATSON *v.* BURWELL A. DUNCAN

AND

WHEELER WATSON ET AL. *v.* BURWELL A. DUNCAN.

*(Two Cases.)*

</div>

1. ESTATE OF DECEDENT.   *Witnesses.   Competency.   Code* 1892, § 1740
   *Husband and wife.   Ante-nuptial contract.*

   Where a married woman died leaving a will and the surviving husband sought under the statute, Code 1892, § 4496, to renounce the will and take a share of her estate, in opposition to which was pleaded an ante-nuptial contract empowering the wife to dispose of her property by will as she should see proper, the husband was incompetent as a witness to impeach the contract as a forgery, under Code 1892, § 1740, providing that a person shall not testify to establish his own claim against the estate of a decedent.

2. SAME.   *Forgery.*

   Facts of the case examined and adjudged insufficient to show that an ante-nuptial contract was a forgery.

FROM the chancery court of Lowndes county.

HON. JAMES F. McCOOL, Chancellor.

Duncan, the appellee, was complainant in both cases in the court below; Wheeler Watson, appellant, was sole defendant there in one of the cases, and he and Henry Watson were defendants in the other case. From decree in complainant's favor, defendants appealed to the supreme court.

In January, 1894, appellee, Duncan, married Mrs. J. W.
Manning. Before the marriage they entered into an ante-nup-
tial contract, which is set out in full in the opinion of the court.
Mrs. Duncan, formerly Mrs. Manning, died in August, 1902,
testate, leaving nearly all of her property, a large estate, to her
two brothers, Wheeler Watson and Henry Watson. Part of
the lands were devised to Wheeler Watson solely, and the other
to him and Henry Watson jointly. Duncan renounced the will,
and elected to take his share of the estate under the law. He
filed two bills in the chancery court of Lowndes county, one
against Wheeler Watson, the other against Wheeler Watson and
Henry Watson, praying for the sale of part of the real estate for
partition and for a partition in kind of the remainder. By
agreement both cases were tried together on the same evidence.
The defense set up to both bills was the ante-nuptial contract,
the clause of which empowering Mrs. Manning to dispose of
her property by will as she might desire being assailed by com-
plainant as a forgery.

*Geo. C. Paine,* for appellant.

To avoid a contract because it has been altered, the alteration
must be material. *Bridges* v. *Winters,* 42 Miss., 143. A ma-
terial alteration is a change which causes the instrument to
speak a different language in legal effect from which it origi-
nally spoke. 2 Cyc., 177 to 180, D. Any change in form and
word merely, even if made by an interested party, which leaves
the legal effect and identity of the instrument unimpaired and
unaltered will not destroy the instrument. 2 Cyc., 190, E;
*Bridges* v. *Winters,* 42 Miss., 139; *Gordon* v. *Sizer,* 39 Miss.,
805.

The case at bar, tested by the law as announced, and even ad-
mitting the full force and effect of the testimony of Mrs. Eich-
oltz, will not entitle appellee to the relief prayed for, and the
cause should be reversed and remanded.

But the appellee says this contract was a mere joke, a piece of pleasantry, and Mrs. Eicholtz and Mrs. Maronne agree with him. To these young people it may have been a joke; the action of this old man, the appellee, and Mrs. Duncan was calculated to impress them as being ludicrous. But to appellee and his wife it was real; it was earnest and solemn.

The testimony of Duncan, the appellee, is incompetent, and the exceptions to it should have been sustained by the chancellor.

*William Baldwin,* on the same side.

"An ante-nuptial marriage contract must ordinarily be in writing in order to satisfy the statute of frauds, but it need not be expressed in technical language or be in any particular form. It is sufficient if it set forth a definite, final agreement or promise in relation to the rights involved." 19 Am. & Eng. Ency. Law, 1234, 1235.

"Ante-nuptial contracts are to be liberally construed to carry into effect the intention of the parties, without regard to the strictly technical meaning of the words used. For this purpose the whole instrument should be considered, and evidence also of the situation of the parties, the surrounding circumstances, and all other matters that will throw light on the intention of the parties will be received." 19 Am. & Eng. Ency. Law, 1240.

Turning now to the contract before us, and considering the whole facts and surroundings of the parties, we have a widow lady in middle life, of feeble health, fairly well off in property, about to be married to a widower with grandchildren and no property. We find further that this woman about to be married to this man is deeply devoted to her brothers, with whom her whole life has been spent, and under contract with one of her brothers, for a consideration already received, to devise him, at her death, her most valuable property.

Now, this woman so circumstanced exacts a marriage con-

tract as the condition of the marriage, and that contract is agreed to and signed and sworn to upon the Holy Bible.

That contract is written by another woman who, to use her own language, had never heard of a marriage contract before, but she in her way wrote it at the dictation of the woman about to be married. And that contract so agreed to, and so written, reads: That the woman is to have absolute control of her property and its management; that the man is not to ask her about her will, that she is to will her property to any person she wants to. How it is possible to find in this contract, so written and so framed, anything vague or indefinite as to the intention of the parties, can only be discovered by those who deal in subtleties that are not permitted unto any save the elect.

The testimony of Duncan, appellee, is wholly inadmissible, as he is testifying in his own behalf against the estate of a deceased person. And he is, moreover, testifying in his own behalf as to acts and declarations of a deceased person, and an alleged alteration of a contract made by such deceased person with himself.

If there was ever a case where both the letter and the spirit of the statute. forbid his testifying, this is the case. Indeed, a stronger case for the exclusion of his testimony cannot be stated. 2 Cyc., sec. 7, p. 250; sec. 1740 of Annotated Code of Mississippi, 1892; *Jacks* v. *Bridewell,* 51 Miss., 881; *Green* v. *Mizelle,* 54 Miss., 220; *Rothschild* v. *Hatch,* 54 Miss., 554; *Jackson* v. *Smith,* 68 Miss., 53; *Duncan* v. *Gerdine,* 59 Miss., 550.


*Betts & Sturdevant,* for appellee.

We do not deny that a husband can, by a proper instrument, relinquish his marital rights in his wife's property, but we claim that this instrument relinquishes nothing, and that it gives Mrs. Duncan no power as to making a will and disposing of her property that she did not already have under § 4488, Code·1892, even if the court should consider the writing genuine, and that

there is no more inconsistency between the marriage contract and the renunciation of the will by Duncan than there is between sec. 4488, which gives a married woman the right to devise her property as she wishes, and sec. 4496 of the same code, which gives the right to the husband, when unsatisfactory provisions are made, to renounce the will.

Duncan is a competent witness in this case. He is not testifying to establish his "own claim or defense against the estate of a deceased person which arose in the lifetime of such deceased person." *Covington* v. *Frank,* 77 Miss., 606.

If it should be urged by the defendant that Duncan is testifying about an agreement made with Mrs. Duncan in her lifetime, that death having sealed her lips, the law will seal his, we would reply that he has a perfect right to testify as to anything, when the purpose of his testimony is to esetablish a claim that arose after the death or at the death of the deceased, and further that he is not testifying about an agreement made between himself and his wife, but denying that there was any such agreement.

The issue of fact, that the only sentence in the alleged antenuptial contract that is claimed to exclude Duncan from the exercise of his positive statutory right to renounce the unsatisfactory provision made for him in the will, was not in the contract as signed by him, is submitted to the court on the testimony read on the hearing; calling attention to sec. 564 of Greenleaf on Evidence (15th ed.), which puts burden on party offering (the defendants here) the instrument in evidence to explain its suspicious appearance.

The contract set up in each answer is new matter, and the burden of proving such a defense always rests upon those asserting it.

It is not denied by complainant that the signature, Burwell Alexander Duncan, is his writing, but the entire issue of fact in these cases is as to whether the writing, as it was when filed

in these cases, and as it now exists, is the same writing signed by Duncan on the eve of his marriage.

In the first place, the very appearance of the paper itself casts discredit on it. It may be said to come in such "questionable" shape as to require those producing it to explain its appearance before its admission in evidence. 1 Greenleaf on Evidence (15th ed.), 564.

*S. A. Witherspoon,* on same side.

There are only two questions involved in the case, and they both arise not from any denial of the case as stated in the bill, but from two separate and distinct affirmative defenses set up in the answer, one of which goes to the entire estate described in the bill, and the other is limited to the lands in Coahoma and Tallahatchie counties.

The first question presented is whether or not the appellee's renunciation of the will of Mrs. Duncan is rendered void, because he had entered into an ante-nuptial contract which estops him from renouncing the provisions of her will.

The first reason why this so-called contract is not a surrender of appellee's right to renounce the will is because the writing contains no such provision. There is nothing in the writing by which the appellee professes to surrender those property rights which the statute gives him as the husband of the deceased, nor does he agree anywhere in this writing to surrender any of his rights, nor does he anywhere agree not to renounce any provisions of her will which might not be satisfactory to him. There is not only nothing of this kind expressed in the so-called contract, but the whole argument of the appellants is based on the contention that the appellee's surrender and release of his marital rights and his agreement not to renounce the provisions of his wife's will is an implication and inference from one sentence of this so-called contract. That sentence is in these words: "You can will your property as you want to any persons." And it is contended that because the appellee

had thus agreed that his wife might will her property to such persons as she might choose, therefore he had agreed by implication that she should have the right to disinherit him. This contention is illogical and unfounded.

In the case of *Williams* v. *Claiborne,* 7 Smed. & M., 495, this court laid down the rule with reference to the construction of ante-nuptial contracts in these words: "We concur fully with the counsel for complainant that the marital rights of the husband cannot be defeated unless an intention be clearly expressed that the property is to be held for the separate use of the wife. Nothing is to be implied against him. This is the rule laid down by the authorities, and is one which we have heretofore recognized."

In the case of *Carroll* v. *Renich,* 7 Smed. & M., 806, the court says that by marriage agreement the marital rights are excluded only to the extent that a valid legal instrument operates to do so. Now, if the rule as laid down in the above cited authorities be the rule—if, in other words, it is only by express stipulations that the marital rights of the husband can be surrendered, and if nothing is to be implied against him—then the so-called ante-nuptial contract, in which nothing is said about the marital rights of the appellee, and in which we find no stipulation that he could not claim his statutory rights in the estate of his wife, and in which we find no agreement to surrender his right to renounce the unsatisfactory provisions of her will—the so-called contract does not amount to a defense.

The second reason why this so-called ante-nuptial contract does not surrender the appellee's right to renounce the will is that said contract is without consideration, and therefore has no legal effect. I do not deny at all that marriage is a good consideration for any contract or conveyance, but the facts of this case show that the pretended contract was not made in consideration of marriage. There is nothing on the face of the contract in regard to the subject of marriage. It does not state that the agreements contained in the paper were made in considera-

tion of the agreement of Mrs. Duncan to marry the appellee; and if marriage was the consideration, that fact must be proven, not by the terms of the contract itself, but by outside testimony.

All the testimony in the case shows that the appellee and Mrs. Manning had bound themselves by contract to their intermarriage long before this so-called ante-nuptial contract was suggested.

The so-called ante-nuptial contract was evidently a mere joke, and was so understood by all the parties present, not only Duncan, but both of the subscribing witnesses.

The fourth reason why the pretended contract is not a relinquishment of the appellee's statutory rights in the estate is that said pretended contract is contrary to public policy, and therefore void. It contains a number of stipulations which no court would attempt to enforce, and for the breach of which no court would award damages. If the contract be a valid one, then all of its terms are enforceable in the courts of the country, and it is manifest that a suit upon these terms of the contract would expose to public investigation those private matters of domestic life which it is the policy of the law to conceal from the gaze of the world.

In the case of *Miller* v. *Miller,* 16 Am. St. Rep., 431, the court considers the validity of a contract by which the husband had agreed among other things to pay to his wife a certain sum of money annually, and by which both parties agreed to refrain from scolding, fault-finding, and anger. The wife brought suit upon this contract to recover the amount promised, but the court held that she had no right of action, because in order to recover it was necessary for her to allege and prove that she had always refrained from scolding, fault-finding, and anger, and that this would raise an issue to be determined by the court, which would necessitate an investigation into matters of domestic life which would be fraught with irreparable mischief, and which were forbidden by sound considerations of public policy. This decision is based upon the ground that according to the genius

of our laws and civilization matters pertaining to the home and its value as such, and which should be controlled by the influences surrounding it, should not become matters of public concern or inquiry.

CALHOON, J., delivered the opinion of the court.

Both these cases were submitted together, and will be decided together. Duncan was not satisfied with the provision made for him by the will of his wife, renounced, and claims one-half her estate, there being no issue of the marriage. He, while a widower of fifty-nine years of age, and she, while a widow of fifty, intermarried under a marriage contract. He admits signing the contract, but seeks to avoid it on the ground that she, after its execution, forged a vital part of it. At the time of the marriage he was without property, and she was, for this section, comparatively rich, and, from her standpoint, the ante-nuptial contract was, as we think, wise and proper in her surroundings; so the case must turn on whether the part of the contract italicized in the following copy of it was or was not a forgery:

"This is a contract entered into between Mrs. J. W. Manning and Dr. B. A. Duncan, this the 30th day of January, 1894.

"I will always let you do just as you wish about everything in this life. You will never keep house unless you wish and of your own accord. I will always let you attend to your own business, and will never ask you about your will. *You can will your property as you want to any persons.* I will love you above all else as long as life shall last. All this I will swear to.

"[Signed]          BURWELL ALEXANDER DUNCAN.

"Witnessed this day by Mrs. Eicholtz and Mrs. J. E. Maronne."

On the next page are written, concededly by Mrs. Manning, these words:

"As Dr. B. A. Duncan has promised and sworn on the Holy Bible to keep this contract written on the other side of this

sheet in every particular, I promise to marry him this evening, January 30, 1894.

"[Signed]                                   J. W. MANNING."

The paper signed by Duncan was written by Mrs. Eicholtz at the dictation of Mrs. Manning, there being present Duncan, Mrs. Manning, Mrs. Maronne, and Mrs. Eicholtz when it was written and signed. There is no controversy as to the integrity of the document except as to the words, "You can will your property as you want to any persons."

Duncan was the first witness examined, and, waiving for the present his competency against the estate, he testifies absolutely that these words are forged, and, to make sure of fixing the forgery on his wife, he testifies that they are in her handwriting. Since the words appear consecutively in the instrument without paragraph, the proof of the forgery must be plain to destroy the paper as to them, especially as they are germane to the immediately preceding words: "I will never ask you about your will." Duncan is not a competent witness in this case, and all his testimony about what was done in his wife's lifetime must be retired from view.

We will examine the testimony of Mrs. Eicholtz, who wrote the instrument. Now, bearing in mind the only words objected to—viz., "You can will your property as you want to any persons"—Mrs. Eicholtz testifies that she did write something where those words are, but cannot remember what; but she says: "The words 'want to' and 'persons' I did not write, and I am not sure about the word 'property.'" With these three words left out, the sentence just following—bear in mind, the sentence, "I will never ask you about your will"—would read: "You can will your ——— as you ——— ——— any persons." The imagination can hardly fill these blanks with any intelligent words other than those she says she did not write. When asked what she did write there, she says: "I do not remember what it was, but I feel as if I thought, if there had been anything about willing property, I would have remembered it, as I remembered the

other part of the contract." Note that "will" had appeared in the preceding sentence, which she did write, and note that other witnesses think the handwriting the same, and note that it was on very common paper, and note that eight years had elapsed, and it is much easier to conclude that the good lady was mistaken than to stamp as a deliberate forger the deceased, Mrs. Duncan, a lady of high character and intelligence, who manifestly had her mind on her will when the contract was drawn. It must also not be forgotten that Mrs. Duncan had carried this paper about with her for years.

Mrs. Maronne, the other lady present, says nothing was said "about willing property," but she says she looked on the whole thing "just as a joke," paid no attention, and did not put down her work to sign it as a witness, but got Mrs. Eicholtz to sign her name for her. These two witnesses hardly fix forgery on Mrs. Duncan in the light of all the evidence in the case.

We come now to the testimony of experts. Dr. Stockard, for Duncan, testifies that, in his opinion, the words "You can," the words "want to," and the word "persons" are not in the same handwriting with the rest of the paper. So, now, according to him, the reading in the same hand is: "———— ———— will your property as you ———— ———— any ————." But, as we have seen, according to Mrs. Eicholtz, the draftsman, it would read: "You can will your ———— as you ———— ———— any persons." Dr. Stockard thinks the words filling the blanks resemble the handwriting on the reverse side of the paper, written, as all concede, by Mrs. Duncan, but he says: "I can't be positive about the identity of the handwriting on the two sides of the paper."

Col. W. C. Richards, summoned as an expert by Duncan, thinks the words "want to" were not written by the person who wrote the contract, and is "inclined to believe" the words "you can" were not. So at most, according to his opinion, the sentence would read: "——— ——— will your property as you ——— ——— any persons." According to Mrs. Eicholtz: "You can

will your ———— as you ———— ———— any persons." According to Stockard: "———— ———— will your property as you ———— ———— any ————." Col. Richards also thinks the word "to" after "want" is in the handwriting of the reverse page written by Mrs. Duncan.

Mr. T. B. Franklin thinks there is a "reasonable doubt" about the words "you can" and "want to" being written by the same hand. He says all the balance is in the same handwriting. Further on he is decided in the opinion that the words "you want to" are in an entirely different handwriting. So, according to him, the reading is: "———— ———— will your property as ———— ———— ———— any persons." According to Mrs. Eicholtz: "You can will your ———— as you ———— ———— any persons." According to Stockard: "———— ———— will your property as you ———— ———— any ————." According to Col. Richards: "———— ———— will your property as you ———— ———— any persons."

Mr. H. Osborn says the words "you" and "can" and "property" and "want" and "to" and "persons" are different in handwriting from the body of the contract. So, according to him, the reading is: "———— ———— will your ———— as you ———— ———— any ————."

Mr. P. W. Maer, for appellee, discards "you can" and "property" and "want to" and "persons," and so, according to him, the genuine sentence is: "———— ———— will your ———— as you———— ———— any ————."

R. F. Williams, for appellants, testifies that, in his opinion, the whole of the contract is in the same handwriting, and no forgery about it.

C. H. Ayres, for appellants, testifies that in his opinion "the person who wrote the body of the document wrote the entire thing, with the exception of the signature."

Now, the original paper is before us. We have examined it with great care and with a powerful magnifying glass. In the only controverted sentence, which is, "You can will your prop-

erty as you want to any persons," we see that the word "prop-
erty" seems to be written above a thin place in the paper, or an
erasure, and so of the last syllable "sons" of the word "persons,"
and so of the word "want;" and the word "to," just after it,
is very close between "want" and "any." Now, at the risk of
being tedious in this important case, involving the good name
of a dead woman of flawless reputation, we put in juxtaposition
what each and every witness says in reference to the only dis-
puted clause, which is: "You can will your property as you
want to any persons." Duncan says the whole sentence is a
forgery. He is contradicted by every other witness. Mrs.
Eicholtz would leave the genuine sentence thus: "You can will
your ———— as you ———— ———— any persons." Mrs. Ma-
ronne remembers no talk about willing property. Dr. Stockard
would leave the sentence thus: "———— ———— will your prop-
erty as you ———— ———— any ————." Col. Richards thus:
"———— ———— will your property as you ———— ———— any
persons." Mr. Franklin thus: "———— ———— will your prop-
erty as ———— ———— ———— any persons." Mr. Osborn thus:
"———— ———— will your ———— as you ———— ———— any
————." Mr. Maer thus: "———— ———— will your ————
as you ———— ——— any ————." Mr. Williams thinks the
whole in the same handwriting with the rest of the contract.
Mr. Ayres thinks the same person wrote "the entire thing." All
the experts called on both sides had about equal opportunities
to become experts. Col. Richards, for appellee, says there are
marks of erasure at the words "property" and "persons." H.
Osborn, for appellee, says there "appears to have been an erasure
under the words 'you' and 'property' and 'want' and 'persons'
in the last syllable of it," and that he "noticed a distinct thin-
ness of the paper at those points, and a thinness in another
point of the paper," not controverted. P. W. Maer, for appellee,
says "it looks as if" there were erasures at "can" and "prop-
erty" and "sons" in the word "persons," and ascertains this by
holding the paper to the light, when "it appears thinner and

more transparent." R. F. Williams, for appellants, says he sees thinner and more transparent places at "want" and "sons" in "persons," but cannot say whether the appearance under the word "property" is thinness or erasure. C. H. Ayres, bank teller, witness for appellants, says: "Under the word 'property' it seems to be a natural thinness of the paper. In the word 'want,' where the letter 'a' occurs appears to have been erased." In all the conflict of testimony and contrariety of expert opinion in this case, and the uncertainty, from the lapse of time, poor quality of paper, and its usage, whether the changes were made before or after its execution, and the nonsense of the sentence without the words objected to, we recoil from fixing the brand of forgery on the memory of Mrs. Duncan.

The other contentions of appellee we regard as without merit.

*Reversed, and decree here in both cases dismissing the bills in both cases; costs of both to be taxed appellee.*