Mrs. Imogene Whitehead et al. *v.* Mrs. Lula Kirk.

[61 South. 737—62 South. 432.]

1. Husband and Wife. *Witnesses. Privileged communications. Declarations to each other in private. Presumption as to nature of communications. Testimony of party to establish claim. Wills.*

Neither husband nor wife will be permitted to testify about acts or words of the other, which acts or words were performed or

uttered when they were alone, and were therefore to be deemed confidential, but where the acts and declarations of either are in the presence of other persons this rule does not apply.

2. SAME.

Confessions of adultery, or the charge of infidelity, made in the privacy and under the confidence of the marriage confessional, are both protected and neither the husband nor wife can testify in regard to the same.

3. SAME.

When the husband and wife are alone, everything said and done is under the protection of the rule and the declarations and conduct of both are presumed to be confidential. That similar acts occur and similar words are used in the presence of others raises no presumption that the presumably confidential declarations and conduct have thereby been released, and that those things said and done in privacy then become public property.

4. WILLS. *Revocation. Presumptions.*

Where the will of a decedent is among his papers with the signature torn off, in such case the law presumes that this was done by the testator, and done *animo revocandi.*

5. WILLS. *Witnesses. Competency. Claim against estate of decedent. Testimony of party to establish.*

On the trial of an issue of *devisavit vel non*, where the result of setting aside the will of a husband would be to give the property therein devised to the wife, she was incompetent to testify as to acts and declarations of her husband made during his life tending to show testamentary incapacity, since under Code 1906, section 1917, providing that a person shall not testify as a witness to establish his own "claim" or defense against the estate of a decedent which originated during the lifetime of such deceased person; the word "claim" is employed in a broad and general sense to prohibit all testimony, the direct, immediate, and final effect of which is to establish in the witness' own behalf a right in or to things prior to the death.

ON SUGGESTION OF ERROR.

1. TESTIMONY OF PARTY TO ESTABLISH CLAIM AGAINST ESTATE OF DECEDENT. *Competency.*

Where the claim of a wife to the entire estate of her deceased husband, if it exist, is owing to, springs from, and originated

in his insanity,, and his insanity is hinged and turns upon his acts and words performed and spoken during his lifetime, she cannot testify to such acts and. words to show his testamentary capacity on the trial of an issue *devisavit vel non*, whereby overturning the will she will establish her claim to the entire estate, as she would thus be testifying to establish her claim or right against the estate of a decedent which originated in his lifetime.

2. SAME.

The claim or right to enforce the payment of a debt against the estate of a deceased person does not originate until the person is dead, but the claim or right upon which the remedy is sought may have originated before or after the death. If it originated before the death, the person making the claim is not permitted to establish same by his own testimony; if it originated after the death and in the course of the administration, such claimant may establish same by his own testimony.

APPEAL from the chancery court of Yazoo county. HON. G. G. LYELL, Chancellor.

The facts are fully stated in the opinion of the court.

*Mayes & Mayes, Barnett & Perrin* and *E. L. Brown,* for appellants.

In this reply, we shall first reply to the suggestion of error filed by Judge Campbell; afterwards to the others.

Judge J. A. P. Campbell, speaking of this court's decision, begins his brief with this observation: "And that it is contrary to general professional understanding in this state, I think may be affirmed from the fact that the admission of Mrs. Kirk as a witness was not assigned as error or relied on by counsel who represented appellants in the court below and that the question of competency of such a witness in similar cases was not raised by other eminent lawyers."

This is an unfortunate observation for appellees; if it has any weight at all, it must operate as a boomerang. The "fact" relied on as evidence of the proposition advanced does not exist. The learned counsel is misin-

formed. First, the position criticised was "relied on by counsel who represented appellants in the court below." The objection was expressly and clearly made, beyond any possibility of misunderstanding, in the court below, and in due time. It was also expressly and clearly assigned in the motion to set aside the verdict, Item 4. Messrs. E. L. Brown and Barnett & Perrin made that motion; and Judge Edward Mayes, in person, made the objection on page 157, *supra.* This latter fact the record does not affirmatively show; but it is the fact; and the record does affirmatively show that Judge Mayes was present at the trial in the court below, and took part in it. Secondly, this action of the court was assigned for error. The 45th ground of error assigned was that the court erred in overruling the motion for a new trial. This was a sufficient assignment under the practice of this court. Besides all which, it was elaborately presented in our brief, and elaborately discussed in the oral argument; and if this court will examine our original brief, it will find that all of appellant's counsel signed it; and part of the subdivision which deals with this particular topic was prepared by Mr. Brown himself as an addition to what had already been written.

Judge Campbell's brief misquotes the statute. The quotations from the Codes of 1857 and 1871 and of 1880 are correct; but when it is said that such "is the language of the Code of 1906" there is an error. In both the Codes of 1892 and 1906 the language is changed, and the words, "of any amount," are not employed. The language is: "A person shall not testify as a witness to establish his own claim or defence against the estate of a deceased person which originated during the lifetime of such deceased person, or any claim he has transferred since the death of such decedent."

If before the Code of 1892 it could have been argued that the terms of the exception were such as to preserve and enforce the common-law disability only in those

cases where the claim in controversy was one capable of statement, as some "amount;" surely, after the elimination of that word from the statute, such argument could no longer be made. The very terms of the statute were, by amendment, made broad enough to cover and include any sort of claim. It had been so decided even under the first form of the statute.

Judge Campbell says "that the decision overturns several decisions of this court, and it is not sustained by one, is, I believe, undoubtedly true." In view of this announcement, we look for some citation to the decisions of this court so rudely dealt with; but in vain. We find nothing but certain statements of general principles, none of which control this case.

It is said that "In an early case on the act of 1857, style not remembered, it was declared by this court that the statute did not disqualify one who was competent by the common law." Grant the proposition; what then? We do not claim such to be the case here. Mrs. Kirk was incompetent by common-law rules; and we say that the statute leaves her so.

It is said that the policy of our legislation has been to sweep away the common-law exclusions, etc. We grant it; but it is also true, and it cannot be denied, that in and by the very legislation which inaugurated and declared that policy, a saving and exception has been always and anxiously made; and the assertion and preservation of that exception has been just as much a part of the larger policy; just as conspicuous a feature, and just as vital. Never has the legislature intended, not for a day, that the removals of exclusions as between the living shall subject the estates of those who are dead, and whose lips are sealed, to be preyed upon by those, or any of those, who survive. We deny emphatically that any such intent was ever to be deduced from the legislation enacted; we deny that there ever was any such "open door" designed.

What policy of the state legislation has been more clear, more studious, and more inflexible, than that which throws every possible safe guard around the estates of the dead? And if the two policies interfere, which in so far as such interference shall exist, must give way and which must prevail? The legislature itself has declared which is the favorite and superior policy; and how can any one assume to say that the policy of protection of such estates, must be narrowed and whittled down by presumptions in favor of the policy about witnesses?

We deny that in this particular category it ever was intended to be a matter of "credibility." How could it be? The lips of the party whose estate is to be charged, are sealed in death. We deny that our decisions warrant any such conclusion. Judge Campbell cites none such. And see where it lands us: for section 2001 of the Code of 1906 (which is in all the Codes) provides that any devise to a subscribing witness shall be void. Here on the very point of establishing a will, a mere devise is nullified by the settled policy of the state, if made to a witness. Is it a question of "credibility?" It is not; the situation is absolutely forbidden, that one shall take a devise, and be a witness. But yet the learned counsel infers, from a general policy about evidence, that in the matter of the complete destruction of a will, the person who is to gain all the estate by such destruction, is qualified to testify, and thereby to establish ownership. The two notions cannot co-exist.

That a state policy should exist since the Code of 1871, for now more than forty years, by which, in order to establish a will, and show the testator's capacity, the witness is disqualified to take even the legacy of a little part; and yet, at the same time, in order to destroy a will, to show the testator's want of capacity, and thereby to capture the entire estate, the spouse surviving is qualified to testify, is a grotesque condition. The legislature could, of course, pass two laws, so discordant; and if so

passed, the court would have to enforce them; but, we submit, such a condition of law will not, and cannot, be deduced by the courts through judicial inference or construction. It can only be allowed when it shall be, as it never will be, expressly so written in the statutes.

The proposition so positively advanced, that the policy of our legislature has been continuous and progressive to open wide the door for the admission of the testimony, and that the tendency of our judicial decisions has been in the same direction—we deny to be correct, if applied to this subject-matter.

In other matters it is immaterial, whether correct or not; but as applied to this subject-matter, the tendency has been distinctly otherwise; and the legislature has more and more signified a determination to protect the estates of decedents from all forms of such invasion, from all quarters.

Somewhere in this diversity of view and this confusion, there must lie a line of judicial truth. We think that with considerable labor and much more thought we have searched it out; and our later conclusion confirms the views which we presented to the court in our original brief. That truth has been sometimes obscured and partly hidden by ill-considered expressions of the court in a few of the decisions rendered. But nevertheless it has been there always, is there now; and by no one has the clew to it been more clearly and definitely shown than by Judge Campbell himself, as we shall presently make plain. And we respectfully but firmly deny that there are "several decisions of this court according to which Mrs. Kirk is a competent witness" on this issue; and that is the whole question.

The question of law thus raised by Judge Campbell necessitates a review of this legislation from the beginning. We shall endeavor to work it out to the satisfaction of this court, from the statutes and the decisions; not by our own views.

"Before statutes on the subject, parties to suits were not competent witnesses in their own behalf. With the removal of the incompetency of parties as witnesses for themselves, there was excepted from the cases in which they might testify, all in which a right is asserted against any part of the estate of a deceased person, no matter in whose hands it might be at the time of the controversy, and which 'right' rests upon something occurring in the life time of such deceased person, and having relation to him." Campbell, J., in *Jacks* v. *Bridewell,* 51 Miss. 881 and 883.

Let us examine those statutes. Prior to the Code of 1857 it was competent for either party in a justice's court, to prove his claim by his own oath, after making oath that he had no evidence to establish it, in his power to procure; and such was the law even in suits against decedent's estates. By art. 18, page 408 Code 1857, this rule was changed, so as to admit either party in that court to prove his own claim or defence, without such preliminary affidavit, and so as to allow one party to require the other to testify. By art. 190, page 510 of that Code, the common-law disability, because of interest, to testify, was removed; but in so doing, the legislature added the proviso "that no person shall be a witness in any suit by or against himself, to establish his own claim to an amount exceeding fifty dollars, against the estate of a deceased person."

*Griffin* v. *Lower,* 37 Miss. 458, explains all this legislation; and it is there adjudged that the object of the proviso was to protect the estate of deceased persons against the operation of article 190, and at the same time to make no change in the practice observed in the justices' courts. Thus the proviso, in its very origin, was declared by this court to be restrictive in the particular with which it deals, of the general policy in removing the common-law disability to testify.

*Lamar* v. *Williams,* 39 Miss. 342, decided in 1860, was trespass for flogging a slave; suit by administrator of

the deceased owner. The defendant was offered in order to prove that the whipping was given in the lifetime of the owner, and by his permission. This court said as follows: "It is insisted that the defendants were not debarred of the right of testifying by the proviso to art. 190, Rev. Code 510, because that proviso applies only to 'claims' against a deceased person's estate, involved in a suit by or against the party offered as a witness; and that, the object of the defendants not being to establish any "claim" against the estate of plaintiff's intestate, they were not within the proviso.

"We do not think that the spirit of the statute justifies this position, or that the term 'claim' should receive this restricted construction. If it be interpreted in the mere sense of a fixed debt against an estate, such as is contemplated by the statute in relation to the probate of 'claims' against a decedent's estate, as is contended in behalf of the plaintiffs in error, a plaintiff in any action *ex delicto* against the estate of a decedent, the cause of which had accrued in his lifetime, or for the recovery of a special chattel, would have the right to testify in his own behalf; and any defendant sued by the representatives of a decedent for a cause of action which accrued in the decedent's lifetime would be authorized to testify to anything which would avoid the demand, such as payment to the decedent, set-off, *non est factum,* and the like, because that would not be to set up any 'claim' against the estate. But this is clearly in contravention of the policy of the statute as it has been recognized by us in the case of *Griffin* v. *Lower,* 37 Miss. 458. The spirit and policy of the proviso appear clearly to be, that a living party, either plaintiff or defendant, in an action in which the representatives of a decedent's estate are a party, shall not be competent to testify in his own behalf to establish his demand or right, asserted and relied on in the action, against the estate, if the matter exceed the sum of fifty dollars; because an undue advan-

tage would thereby be given to the living party, by enabling him to testify to matters which took place between him and the decedent, and which resting entirely in the private transactions of the parties, could not be disproved or explained by reason of the death of the other party.''

Thus, more than fifty years ago this court declared that the statute of 1857 was to be applied by its spirit and policy; and defined such spirit and policy to be that a living party, either plaintiff or defendant, in an action in which the representatives of a decedent's estate are a party, shall not be competent to testify to establish his demand or right asserted and relied on in the action against the estate, because of the undue advantage which would be given to the living party. And the court declared that the word ''claim'' was not to be interpreted merely to mean a ''fixed debt,'' and extended it to the defence of a license given, in an action for a battery.

The next step was the Code of 1871, section 758 which was as follows: ''No person shall testify as a witness to establish his own claim of any amount, for or against the estate of a deceased person, which originated during the lifetime of such deceased person. But such person so interested shall be permitted to give evidence in support of his demand against the estate of a deceased person which originated after the death of such deceased person, in the course of administering the estate.''

Two things are to be noted in this statute. First, the legislature seems to have gotten over the idea which it had previously acted on, that persons would not rob estates of the dead in small amounts; and so the exclusion was extended so as to embrace claims of any amount, whether over fifty dollars or not. Here was no such progressive removal of disability, and commitment of the matter to credibility, as Judge Campbell insists on; but directly the contrary. Secondly, the final sentence of the section expressly provides in what cases a party inter-

104 Miss. 50

ested might testify, and the permission is given to such cases only ''in support of his demand against the estate of a deceased person which originated after the death of such deceased person, in the course of administering the estate. This language was employed, in view of the decision in *Lamar* v. *Williams, supra;* and it seems intended to embody in legislation the fundamental philosophy of that decision; that the claimant should not ''testify to matters which took place between him and the decedent,'' etc. The statute, as a whole, and clearly, contrasts and opposes, by its very terms, the two expressions of those claims which ''originated during the lifetime of such deceased person,'' and of those demands against the estate of a deceased person which originated after the death of such deceased person in the course of administering the estate.

In *Witherspoon* v. *Blewett,* 47 Miss. 570, decided in 1873, it was held that even under the act of 1857, the claimant was competent to testify about his dealings with the administrator. The court discusses both statutes; that of 1857 and that of 1871; and it says this: ''The manifest reason for the exclusion of such witness is to shut out *ex parte* evidence touching matters and transactions which transpired in the lifetime of the deceased, after death has sealed the lips of one of the parties, so that his version and explanations and statements cannot be heard. It was, too, to prevent the establishment of false and simulated claims, by such *ex parte* and interested testimony, against estates.

''But does the reason and spirit of the proviso to the section apply where the facts to which the witness testifies, arose after the intestate's death, touching, too, a cause of action which had its inception posterior to his death? The interpretation put upon the statute is broader than its words, but was demanded by its reason and intendment. This much is plain; if the suit be for a tort or a contract done or made in the lifetime of the in-

testate, the survivor is incompetent to prove the one or the other against the estate; so, if he is sought to be charged by the administrator with either, he cannot testify in his discharge.

"Following in the line of the liberal exposition which has been given to the statute, we have been brought to the conclusion that, when no cause of action existed in the lifetime of the deceased, but originated afterwards, either for or against the estate, the parties to the suit are competent witnesses as to these matters which originated after the intestate's death. In order to quiet doubts on this point, the Code of 1871, art. 758, allows such interested persons to testify, "in support of a demand against an estate, which originated after the death of such deceased person, in the course of administering the estate. This because the administrator or executor may be supposed to be conversant with such demands; and the reason of the exclusion, where the cause of action existed in intestate's lifetime, has no force."

*Jacks* v. *Bridewell,* 51 Miss. 881, decided in 1876 was on the Code of 1871. Nowhere has the true intent and purpose of this legislation been declared with more clearness and emphasis, than here: and Judge CAMPBELL, for the court said:

"The term 'claim' was held in *Lamar, et al.* v. *Williams, et al.,* 39 Miss. 342, to include any 'demand or right' asserted and relied on in the action against the estate, and as the Code of 1871 employs this term, it may be regarded as having its meaning fixed as above. Jacks in his bill asserts a 'right,' which originated during the lifetime of Braswell, and out of the transaction with Braswell, and if it is 'against the estate of a deceased person,' he is incompetent as a witness. The term 'estate of a deceased person,' is used in its broader sense, to signify all the property of every kind which one leaves at his death. Therefore, any 'right' asserted against real or personal property left by a deceased person, as

accrued to the party by virtue of a dealing between him and such person since deceased renders the person asserting it incompetent as a witness to maintain in his own behalf such assertion of right. The exclusion is not confined to cases in which the controversy is between him who would testify to his ·'claim' or 'right,' and the administrator or executor of the deceased person, but it extends to every assertion of such right by a party to any part of the estate left by a deceased person, and claimed by such party, or to be subject to his demand, by reason of an alleged transaction between such party and the deceased person. To deny the competency of a person to support as a witness his right or demand, as he asserts it as plaintiff or defendant against the administrator or executor, and to allow such person in a controversy with a distributee, or an heir or other person, to testify to his claim or right of demand, as to the personal or real estate left by the deceased person, and 'which originated during the lifetime of such person,' would be to disregard the language of the statute, and the manifest purpose in passing it. . . . The object of the exception is to prevent a survivor of some transaction, alleged to give him a right against the property left by the deceased, from supporting his alleged right by virtue of such transaction to which the deceased person was a party, by his own oath, when he cannot be confronted by him with whom he claims to have dealt and obtained some right, as against some part of the estate of the deceased. The object was to prevent the assertion of rights to what a deceased person left, by virtue of some act of such deceased person, from being supported by the testimony of him who asserts the right. Without this prohibition to testify in such cases, the unscrupulous might boldly assert most important rights to propery left by deceased persons, acquired, as they would testify, by dealings with such persons in his lifetime, and sometimes, obtaining credit for their testimony, would inflict serious injury

upon those who held any of the estate of such deceased party by descent or devise, or under those to whom it descended or was devised. 'When death has placed the evidence of one of the parties to the transaction, out of which the claim arises, beyond the pale of the court, the statute enacts that the other shall not be heard, for or against such claim. As to that transaction, both of the parties thereto are dead, one through natural causes, the other by legislative enactment.' "

Confrontation is the central idea. Hear both sides, or neither: That is the Golden Rule. It is the touchstone for all these questions. There is not, and there never has been, any other policy thoughtful announced in this state.

Our court has repeatedly, in various ways, announced the rule for which we contend. In view of the emphatic statement of the court, in *Jacks-Brigewell* case of the very purpose and object of the statute, we do earnestly protest against the effort now made to defeat that purpose by a narrow and twisted construction of the phrase, "which originated during the lifetime." That phrase was in the act of 1871; itself originated in and by that act; it was so construed and valued, it has been re-enacted in each subsequent Code. We invoke the very rule which Judge Campbell invokes, as to this.

In *Rothchild* v. *Hitch*, 54 Miss. 554, decided in 1877, the *Jacks case* was followed; and the court said of it that, "This case was decided after much deliberation. Our views are expressed in the opinion in very carefully chosen language, cautiously applied to the facts of the case. We have since considered the views therein set forth and adhere to them. Tested by them, A. L. Hatch was not competent to testify." In this, the *Rothchild-Hatch case,* the court overruled *Reinhardt* v. *Evans*, 48 Miss. 230, and held that an assignment of the claim restored the competency of the original owner as a witness to prove it. Whereupon, the very next legislature passed

the act of 1878, page 190, providing that no such assignment should have the effect to render the assignor a competent witness. Could there be a clearer indication that it has not been the policy of the state to expand the field of competency on this line? But the contrary, rather.

And when the Code of 1880 was enacted, only two years later, section 1002 of it was an exact reproduction of section 758 of the Code of 1871, construed as it had been, with the insertion therein of the clause, "or any claim he has transferred since the death of such decedent;" such clause being the direct outcome of the said act of 1878. So that into the Code of 1880 itself was plainly wrought the determination of the law making department of our state, still to protect rigidly from all forms of laxity about witnesses, the estates of decedents.

The Code of 1892 came next; and section 1740 thereof is the same as section 1602 of the Code of 1880, except that the words "of any amount" are omitted. If there is any difference between the two sections, the provision in the later Code is a broader one of exclusion because it excludes in case of any claim whatever, whether measurable in terms or an "amount" or not.

In short, and to conclude this branch, we insist that there is no such policy in this state as to this particular matter, as Judge Campbell assumes for the basis of his whole argument; that the whole progression of legislation on this line has been toward a sustained and vigilant exclusion of such one sided, unjust and dangerous testimony; has evidenced an invincible repugnance toward exposing the estates of the dead to so certain a danger, and toward a stopping of such gaps in the barriers of safety as occasional judicial utterances have indicated to exist in the laws already enacted.

There is another error which runs through the whole of this suggestion. It is in the substitution of a mere illustrative statement of this court, made *arguendo,* for

the very crux of the case, and an assault on that illustration.

His fundamental proposition is that Mrs. Kirk's claim "arose, sprang up, *eo instanti,* upon the death of her husband, by virtue of statute taking effect upon that event." (The *Covington-Frank case,* 77 Miss., 606 seems to be alluded to, although not cited.) "Until then she had no claim, no right." The essential features of the suggestion are, therefore, that her claim could not have "originated during the lifetime of the deceased. Until his death "it was nothing, non-existent, not even a shadow, a mere possibility, dependent on the contingency of her surviving him, and his ownership of the property at his death." It is asked: "When did the claim, the complete, the perfect claim originate? When could it be asserted?" It is said that the statute means a claim, a real right, capable of assertion." . . . "Did Mrs. Kirk have such a claim in the lifetime of her husband? Could she assign it? On her death would it have descended to her heirs?" etc., etc.

The vice in the whole argument is that it assumes as a definition of the word "claim" as that word is employed in the statute, a restriction of meaning which is incorrect, and is directly in the teeth of the purpose and meaning of the word and of the statute, as announced in several cases, and recognized for fifty years past. The expression is not to be confined in its application to such claims or demands as import an assertion of a direct legal liability of the decedent to the claimant, or of a present title of the claimant in or to decedent's estate, or some part thereof. The very first case, but one, *Lamar v. Williams,* 39 Miss., 342, cited above, settled that. The claim successfully asserted there was merely defensive against an action of tort; a license given by the decedent in his lifetime; and the court denied that the word 'claim' should receive the restricted construction, or be interpreted in the mere sense of a fixed debt, or of a demand

*ex contractu.* The court enlarges on the spirit of the statute, and points how a demand and a right are different, and that there are different sorts of rights. In view of this decision, what possible force can there be in the suggestion that Mrs. Kirk's claim was not such an one as she could assign or as would descend to her heirs? None whatever.

So in the case of *Rothchild* v. *Hatch,* 54 Miss. 554, one Hatch was held incompetent to testify about certain statements made by the deceased in his lifetime about the nature of the deceased's holding of the land in controversy after his death. Just as in the case at bar, what Hatch was offered to prove was, an evidential occurrence in the lifetime of the deceased (to wit, the conversation and admission), which being proven would tend to establish the existence of a certain condition of things during the life, in a controversy originating after the death. This court said (Judge Campbell delivering the opinion) that:

"It is impossible to have an intelligent conception of the rule to guide in determining the competency of a witness under article 758 of the Code, without a clear idea of the meaning of the terms 'claim' and 'estate of a deceased person,' as used in it. The decision in *Lamar* v. *Williams,* 39 Miss. 342, interpreted the term 'claim' to include any demand or right asserted or relied on as against the estate of a deceased person."

Opposite counsel not only place too restricted an interpretation on the word "claim," and one wholly unauthorized, but also too restricted an interpretation on the other expression used in the statute, "which originated during the lifetime of such deceased person." He argues throughout (it constitutes the backbone of his whole suggestion) as if the word "originated" imported the notion of consummation of title, or vestiture of right, prior to the death. He says the claim contemplated by the statute must be "complete" or "perfect" before the

death, all the expressions employed by him conveying the meaning that the claim asserted must be one about some sort of a vested interest; and then he asserts that Mrs. Kirk's interest was not such, but only sprung into existence *eo instanti,* on the death, etc.

It is too narrow a view, and, also, is not authorized, either by the ordinary lexicographical use of the word "originated," or by its special judicial and legislative history in this connection.

Webster defines the word "originate," thus: "v. t.; to give an origin or beginning to; to cause to be; to bring into existence; to produce as new;" and "v. i.; to take first existence; to have origin or existence; to begin to exist or act." And he defined the word "origin" thus: "The first existence or beginning of anything; the birth; that from which anything primarily proceeds; the fountain; the spring; the cause; the occasion." Amongst the synonyms he mentions, "commencement, rise, source, spring, fountain, derivation, cause, root, foundation."

It will be seen, therefore, that the word itself imparts no such concepts of a consummated and complete right or title as the whole argument of counsel attributes to it.

Now as to the statute and the decisions. We have already treated them in part in other connections; and shall repeat as little as possible.

Observe: the provision as a whole consists of two sentences; and so in section 758 of the Code of 1871 which please consult anew. Then note the second sentence of that same section. It constitutes a manifest continuation of the essential legislative idea, expressed in the first sentence. It is explanatory, and by way of contrast or antithesis; it is introduced by the word "but;" a word proper to such rhetorical uses, and commonly understood to be so used. The statute, then, in its very first form as an independent provision, embodied two branches: first, no person shall testify to establish his

own claim which originated during the lifetime of the deceased; but second such person so interested may testify in support of his demand which originated after the death, in the course of administering the estate. If these provisions be given the close and narrow construction contended for by Judge Campbell; and if the phrase "originated during the lifetime" cannot be included in its prohibition this claim, because it originated by the death, and *eo instanti;* then, on the other hand, and certainly, this claim cannot, for the very same reason, be included in the permission of the following phrase "which originated after the death of such deceased person, in the course of administering the estate." For why should it be excluded in the one case, and included in the other? The same word "originated," is employed in both branches of this clearly connected enactment. We submit that what the legislature had in mind was this: that, first, it prohibited all testifying by parties in order to establish claims which originated in the lifetime of the deceased; and, then, to make certain its meaning, specified that such testifying as should be allowed was to be about demands which originated after the death and in the course of administration.

The statute was obviously enacted with reference to the previous statute of 1857 and the decision thereupon of *Lamar* v. *Williams;* and its central notion was to reduce into positive law the fundamental and saving proposition in that case contained, that a living party would have an undue advantage if allowed to testify to matters which took place between him and the decedent. That, and exactly that, is what the statute was intended to prevent.

Judge SIMRALL, in 1873, two years after the statute was passed, said in *Witherspoon* v. *Blewett, supra,* "This, because the administrator or executor may be supposed to be conversant with such demands; and the reason for the exclusion where the cause of action existed in the

interstate's lifetime has no force." It is a contempo-
raneous exposition by this court of the reason and pur-
pose of the statute:

In *Strickland* v. *Hudson,* 55 Miss. 235, decided in 1877,
Judge CAMPBELL said of this very statute, that "The
principle is that the living party shall not be heard to
give his version of a transaction about which death has
sealed the lips of the other."

And speaking of the exclusion of Strickland as a wit-
ness, he said: "His exclusion was within the letter, but
not the spirit and intent, of the statute on the subject of
parties testifying. *Qui hoeret in litera, hoeret in cortice.*

And so we say: *Qui hoeret in litera, hoeret in cortice.*
All the argument about what the word "claim" means,
and what the phrase "originated in the life time" means,
is nothing but a "sticking in the letter and the bark."
The principle of it all is announced in this court's opin-
ion: "the policy of the statute is to close the mouth of the
living because death has sealed the lips of the dead."

*Covington* v. *Frank,* 77 Miss. 606, will, of course, be re-
lied on by Judge Campbell in this connection. It seems
to be the case from which he drew his idea, and his form
of expressing the idea. But that case, properly weighed,
is no answer to our contention. We considered and ana-
lyzed it, to some extent, in our original brief, to which
we refer. Judge Terral, inadvertently muddied the wa-
ters here, and the case should be connected and justly
valued. The decision was all right, and the concluding
part of his opinion Judge Terral placed it on the true
ground; that "the claim directly in issue here is the
claim of these executors; the right of Mary Covington
and Cornelia Miller is only indirectly concerned." In
other words, in that case, they were not testifying to
"establish" any claim of theirs against the estate, and no
decree rendered in that case would have determined any-
thing as between them and the estate. It was collateral;
and the decision actually made by this court was in ex-

act accord with the old rule, settled as far back as *Faler* v. *Jordan,* 44 Miss. 283, l. c. 293. In the first part of the opinion Judge Terral simply stressed the wrong word of the statute; he spoke of "originated" when he should have spoken of the phrase "to establish." And he announced a rule of strict construction, which was directly in the teeth of construction according to the spirit, announced in the other cases. That most estimable gentleman and good judge simply slipped a cog in this opinion; he stuck in the bark.

Judge Campbell asserts, and he insists with much emphasis that Mrs. Kirk had no claim which originated before the death; that she had nothing, not even a shadow of a claim; that she had a mere expectancy; that her claim arose by the death and by it alone, and could not exist before, etc. He speaks of our suggestion of an inchoate right as being "fanciful, farfetched and inapplicable."

Such a notion is not the common understanding of our people about the claim of a wife on her husband's estate; and it was not what the legislatures had in mind in the enactment of these laws. Counsel argue the question as if there could be and was no other claim or demand or right possible, except one constituting technically *jus ad rem* or *jus in re*; and there is where they fatally err.

When Mrs. Kirk was married, then and there she immediately acquired a status as incident to her wifehood; she became and was his statutory heir. That status was not affected by any question about what particular property he might own at his death, for her to inherit; she would be just as much his heir if he left only a cow and calf as she would be if he left a railroad. Whatever the items or the value of his estate, the law, immediately on marriage, fixed the extent of her right, such extent being, by law, variable on certain contingencies; if he had no children she took the whole; if he had children, she took a child's part. There was another possibility: her

husband might make a will, and by that will either enlarge or reduce the proportion which she would take by the law in the event he should die intestate. Ordinarily, this power of the husband continues until his death; and therefore, until his death the extent of her expected interest in his estate remains subject to his will and disposal.

But Mrs. Kirk's "claim" is that long before his death Mr. Kirk lost his testamentary capacity, lost his right to make a will; and thereupon, and thereby, long before his death, the law fixed in herself the sole estate on his death if she should survive him. And this momentous change in her rights in and about his estate, which came about, as claimed, years before his death; which gives her by law the one-half of his estate, independent of and against his intention and his will, is to be proven by her testimony.

To put it in short: the "claim" is that long prior to Kirk's death a condition of things came about, and thenceforward continuously existed, which fixed in her, then and there, beyond his power to alter, the status and right to take as her own his entire estate on his death if she survived him, which right she is now asserting by her testimony. As a practical fact, it means in this case about fifteen thousand dollars. To admit as it is admitted, that this lady could not, under the statute, take the stand and testify that her husband had given her a calf, and yet to claim that she can, by such narrow constructions of the law as are asserted herein, claim and seize the entire estate, is indeed to strain at a gnat and swallow a camel.

The legislature had no such intent; and that is the compass by which we are to be guided.

If that be the law, then not only is every testator's estate exposed to this peril; but also the estate of every single person who shall die intestate is also exposed to the peril of seizure by any unscrupulous person who may

come into court with a story about a secret marriage, proving such by his or her own testimony alone. It is hard to believe that the legislature intended this; and yet, why not, if the other?

*J. A. P. Campbell, Campbell & Campbell, Barbour & Henry* and *Whitfield, McNeil & Whitfield,* for appellee.

Counsel seemed enamored of *Jacks* v. *Bridewell,* 51 Miss. 881 and pay a high compliment to the opinion in it, of which, as its author, I am proud. I stand on that case and the cases following it, every one of which, as I remember them, deals with a claim as defined by the court in several other cases, i. e., a money demand or property right, existent, complete and perfect in the lifetime of the decedent. From memory, I feel authorized to say that not a decision of our court, as I believe, departs from definition of "claim" as I have defined in my suggestion. I believe not a decision of the court can be found holding that a claim is anything except a money demand or property right, complete and perfect, in the lifetime of decedent. I think every case involving that question presents that feature, and not one of the "sixty" holds as a claim such a possibility as husband or wife has in the estate of the other. It seems to me a confusion of terms to speak of such as a "claim" in the meaning of the statute. According to counsel, Mrs. Kirk had a claim within the meaning of the statute. If so, and she had assigned it in the lifetime of her husband to one of her children or another, there would have been no objection to her competency as a witness, for only a claim assigned after the death renders one incompetent. Can that be true? If it is the purpose and effect of the law to exclude a survivor in such case, all necessary to defeat it is to assign the claim and the purpose of the statute is defeated! Is the statute so impotent? I do not think it can be held that a claim meant by the statute is other than a real one, an actual one, a money demand or property right, assert-

able, assignable, maintainable and transmissible by death, and it is certain Mrs. Kirk had no such claim until the death of her husband created it.

To settle the meaning of "a claim" and "originated" is to dispose of this controversy. The meaning of "claim" as used in the statutes, has been settled from an early day by this court to be a money demand or property right, asserted offensively or defensively against the estate of a decedent. In *Lamar* v. *Williams,* 39 Miss., 342, the defendant claims immunity from a pecuniary demand (damages for the value of a slave he had beaten to death) because, as he desired to testify, of a license by deceased to do the beating. In all the cases in which a person was held incompetent to testify it was of some dealing or transaction between the witness and a deceased person or some property right accrued to the witness. I think in all the cases in which a witness was held incompetent, he proposed to testify of some dealing or transaction with a deceased person, or some money demand or property right which accrued to him in the lifetime of a decedent.

Because, by express provision of a statute as to wills, a gift to a subscribing witness is void, therefore, it is argued Mrs. Kirk is incompetent, and yet an executor, who was the principal beneficiary under the will, was held competent to prove the will, since the statute applies only to a subscribing witness. Such is the logic of counsel. According to our decisions, as I understand them, Mrs. Kirk had no claim until the death of her husband. Certainly it has been so expressly declared by this court, and the contrary has never been affirmed or suggested, and, in the nature of things, cannot be.

"Originated" as applied to a money demand or property right, or defensively as immunity from a money demand, has never, so far as I know, been used as appropriate in reference to an heir or legatee. It could not be with propriety, because manifestly an heir or legatee

has no claim originating in the lifetime. The definition of a claim by this court excludes that of an heir or legatee.

To exclude a witness, he must fall precisely within the terms of the statute, 39 Miss., 17. He must have a claim defined by the court as a money demand or property right and it must have originated as such in the lifetime of deceased, not that the witness stood in such relation to the deceased that, in a prescribed contingency, he would have a claim, but it must have existed as a claim (money demand or property right, complete and assertable as such) in the lifetime of the decedent.

This court, from the beginning, has confined the operation of the statute within the limits of its language and shown a determination to narrow the grounds of exclusion of witnesses. It has, uniformly held that for a witness to be excluded, he must come precisely within the terms of the statute, and the legislature has not changed the statute, except to provide for incompetency when the claim originated in the lifetime of deceased, i. e., comes into being as a money demand or release from one, or a property right accrued during the life, not afterwards, or is assigned after the death of the party against whose estate it is asserted.

Counsel labors to show legislative purpose to protect estates of decedents against spoliation by witnesses, and yet no act of legislation is cited, or can be, changing the law as declared by the court as to competency of witnesses except that which makes one incompetent who has assigned his claim after the death of decedent. So, if one shall assign his claim to a friend or kinsman in the lifetime he may prove it against the estate of defendant without objection.

*Covington* v. *Frank,* 77 Miss., 606, distinctly holds that the right or claim of an heir does not originate in the lifetime of the decedent. How is that to be disposed of? So far as I know it has never been questioned in any deci-

sion of this court. It is so manifestly right it cannot be. There are other cases decided by this court to the same effect, but as I have not the reports before me, I will trust the court as to them. The court in *Covington* v. *Frank,* 77 Miss. 606, cites *Kelly* v. *Miller,* 39 Miss. 17 and *Tucker* v. *Whitehead,* 59 Miss. 594 and declares that the claim of a legatee and devisee did not originate in the lifetime of the deceased. If there is a decision to the contrary, I am not aware of it. Is it not settled in this state that Mrs. Kirk's claim did not originate in the lifetime of her husband? If so, that is an end of the argument. Her claim as survivor of her husband did not originate until she became such, and she is a competent witness. No case within my knowledge holds the contrary.

In *Watson* v. *Duncan,* 84 Miss. 763, the surviving husband was properly held incompetent to testify about an antenuptial contract with his deceased wife. That has no bearing on this case.

Running through the numerous cases, two grounds of incompetency and exclusion are found, i. e., dealings, transactions with deceased constitutes one class, and originating in the lifetime of decedent constitutes the other class. A consideration of this will, I think, dispose of all supposed grounds of conflict or want of harmony in cases. If the testimony relates to a dealing or transaction with deceased, it is incompetent. If the claim originated in the lifetime of deceased, claimant cannot testify. Application of this test will dispose of all supposed conflict in cases.

As our state policy is in favor of competency with few exceptions, to exclude a witness he must come clearly within some one of the few exceptions. Competency is the rule, incompetency the exception. Cases are divisible into two classes, some involving dealing, transactions between parties, others involving claims in favor of or against estates of decedents originating in the life-

time of deceased. To exclude, witness must offer to testify for or against a claim (money demand or property right) which originated in the lifetime of decedent. In some of our numerous cases a witness was held incompetent to testify to dealings, transactions, between him and decedent. In other cases the claim of the witness originated or did not, in the lifetime of decedent. To exclude, the testimony proposed must be about a claim (money demand or property right) which originated (accrued, existed as such) in the lifetime of decedent. I think our cases, for the most part, may be classified and arranged accordingly. Had I the physical ability to do it I would examine and arrange the cases accordingly, but alas! sixty-six years of lucubration, since I was licensed as a lawyer, make the labor too great.

The very ingenious and seductive proposition of counsel for appellants, (which was accepted by the court and which on my first reading of the opinion captivated me, so plausible it is and so artfully put) that the effect of the testimony of Mrs. Kirk is to give her the estate, wherefore she is incompetent. This is fallacious and misleading. The statute is not to be interpreted by an assumed result or effect of the testimony of a witness. The question is competency, not the effect or result of the testimony. The witness who has a claim against a decedent in his lifetime and has transferred it then is competent under the statute, which shows that the statute does deal with results. It prescribed grounds of exclusion, within one of which a witness must be to be excluded, but it has no concern whatever with the result of testimony. The legislature has declared that persons in a prescribed situation with reference to estates of decedents, shall not be competent to testify, and the only question for a court is, does a witness occupy the situation which causes incompetency? The possible or probable effect of the testimony cuts no figure in determining competency, and yet the labored and plausible argument

of the accomplished advocate of the cause of appellants is without the least value, separated as it must be, from consideration of the assumed result of the testimony. Surely, the court, with attention fixed on this correct view, will regard the seductive argument of counsel as fallacious, misleading, and unsound.

It seems to have required much effort of the accomplished scholar, thinker, and lawyer to evolve the proposition, of which he is enamored, which is found in no decision of the court which has decided "sixty" cases under the statutes involved, and seems never to have occurred to anybody else, that because the effect of testimony of a witness, if believed, will or may secure title to property, therefore the witness is incompetent. That is certainly an addition to the statute—a new ground of incompetency, never heard of before, unknown to statute or decision.

Distinguished counsel for appellants, in their reply to the suggestion of error, in speaking of the suggestion of Judge J. A. P. Campbell, use the following language: "The vice of the whole argument is that it assumes as a definition of the word 'claim,' as that word is employed in the statute, a restriction of meaning which incorrect, and directly in the teeth of the purpose and meaning of the word, and of the statute, as announced in several cases and recognized for fifty years past. The expression is not to be confined in its application to such claim or demand as import as assertion of the direct legal liability of the decedent to the claimant, or of the present title of the claimant in and to decedent's estate, or some part thereof."

We must respectfully submit that what counsel denominates as the "vice of the argument" is the virtue of the argument. It is the philosopher's stone, the judicial truth, which, as counsel says, we are all endeavoring to find in this case. This is the distinction which is elaborated in the suggestion of error of Campbell & Campbell,

and was not alluded to nor discussed in the original briefs on either side, and not adverted to by the court in its decision rendered in the instant case. It is a distinction so aptly made by Mr. McWillie in the case of *Covington* v. *Frank*, 77 Miss. 606. It is the distinction set forth in the numerous cases from other states referred to in the brief of Campbell & Campbell. Though distinguished counsel says that the court has enough Mississippi law to deal with, without investigating the decisions of other states, we thought that our decisions are in great confusion, especially as there are distinguished supreme courts of other states who have passed upon this very question, and, as stated in the suggestion of error of Messrs. Campbell & Campbell, almost without a dissenting opinion, with a unanimity that is remarkable, the decision of other courts have always held, whenever the question was raised, that legatees and devisees and heirs are competent witnesses in a will contest.

Distinguished counsel surely is not attempting to sidetrack the court, or to play the role of "Old Sarcasm," in that distinguished book "Flushtimes of Mississippi and Alabama," written by Judge Baldwin, when Old Sarcasm had a young lawyer fined before a justice of the peace for reading from Story on Contracts, because it was Yankee law, and stated that it was an insult to the Mississippi justice, trying a Mississippi case, to read to him a Massachusetts law, referring to the title page of the book, to show that the book was published in Boston, Mass. The justice very promptly fined the young man twenty-five dollars for contempt of court. Is distinguished counsel attempting to play this role when he says that he has no time to refer to the decisions of other courts because we are trying a Mississippi case before a Mississippi judge, and have plenty of Mississippi law?

The word "claim" in the statute evidently means some claim in which the decedent in his lifetime had against the party litigant, or which the party litigant asserts against

the estate of the decedent, accruing in the lifetime of the decedent. The contest over the property by the devisees and heirs is not such a claim, and this point made by Judge Campbell, and criticised by counsel, instead of being the vice of the argument, is the very truth of the argument.

The truth is, however broad construction our courts may give to the word claim, we assert without fear of contradiction that it has always been a claim which the decedent had against the other party litigant, or which the other party litigant was asserting against the decedent, or a representative of the decedent. This is not a controversy against the estate. It does not diminish or detract from, nor add to or increase the estate, but it is a controversy over the estate. This distinction, as stated above, is the ground work of the numerous decisions cited by Campbell & Campbell from other states, in their suggestion of error, and which we think was exceedingly proper and appropriate, as stated above.

Counsel also criticize the suggestion of error of Messrs. Whitfield, McNeil and Whitfield and Messrs. Campbell & Campbell, because they cite numerous cases from our own supreme court in which, in will contests, both heirs and devisees have been permitted to testify, and say they are not authority because the point was not made in the court below. What becomes then of the case, so strenuously relied upon by opposite counsel, of *Jacks* v. *Bridewell,* 51 Miss. 881. We have searched this record most carefully, and we cannot find where the point was made in the court below, where it was assigned for error in the supreme court, where it was even adverted to in the briefs of counsel in the case, but the court, speaking through Judge Campbell, of its own motion raises this question for the first time in the supreme court.

If *Miller* v. *Kelly,* 39 Miss. 17, *Mullens* v. *Cottrell,* 41 Miss. 291 and *Hitt* v. *Terry,* 92 Miss. 671 are not authority, all of which cases are will contests in which de-

visees and heirs are allowed to testify, because the question was not raised in the court below, how is *Jacks* v. *Bridewell* authority when the question was neither raised in the court below, nor by assignment of error, nor by brief of counsel? The truth is, these cases are authorities. They are authorities showing the judicial mind of the supreme court of the state of Mississippi, whenever the question of heirs and devisees in will contests came before them for decision.

The suggestion of error of Messrs. Campbell & Campbell is adroitly criticized for quoting the evidence of Miller in the case of *Miller* v. *Kelly,* 39 Miss., 17. This was done to bring the mind of the court to the fact that the very evil that they are attempting to correct by excluding Mrs. Kirk's testimony was committed in this case, and was in the record, and before the court, and furthermore the point was made in the court below that Miller's testimony was incompetent because he was an interested party, and therefore could not testify against the estate of the deceased party. Counsel says, however, that this case is not authority, because eminent counsel in that case made only the objection that he was incompetent because of article 45, page 434 of the Code of 1857, and that article 190, page 510 Code 1857, which prohibited persons testifying against the estate of deceased persons was not brought to the attention of the court. This article was staring the court and counsel directly in the face. If it had any applicability to the competency of Miller, the court should *sua sponte,* of its own motion, raise the point in *Miller* v. *Kelly.* *Miller* v. *Kelly,* 39 Miss., 17, is an authority, and the court cannot get around it.

Counsel says that *Miller* v. *Kelly* was decided correctly; if it was decided correctly, it is a case in point, although the court may have given the wrong reason for the decision. This point is elaborated by opposing counsel in his brief, when he says that Judge Terral, in the

case of *Covington* v. *Frank,* 77 Miss. 606, renders a right decision, but gives a most iniquitous reason.

There is no escape from the fact that *Kelly* v. *Miller,* 39 Miss. 17, is authority for our contention, and a strong authority, and there is no escape from the fact that *Mullens* v. *Cottrell,* 41 Miss. 291, in which the heir was permitted to testify as to insane delusions of her father, in a contest against his will, is also an authority, and, while the objection was not made in this case, it is evident it was not made because the question was settled in *Miller* v. *Kelly,* 39 Miss. 17.

With so much of the brief of counsel for appellant, Judge Mayes, as exhausts itself in pleasant raillery against Judge Campbell, for saying that his view was "fanciful, farfetched, and inapplicable," and against what he calls the positiveness of our assertions, and the marshaling of Chinese gongs, etc., most assuredly I shall not waste one moment. I take it, what this court wants is the authority of decisions, and clearness in statement of principle, and I say, without the least reservation, that there is not one solitary new thought advanced by Judge Mayes' attempted reply to the briefs filed by counsel for appellee in support of their suggestion of error.

Judge Mayes criticizes the citation of *Jamison* v. *Jamison,* 92 Miss. 468 and *Roberts* v. *Sivley,* and his whole proposition is that the cases passed the suggestion that we are making here *sub silentio* and that they do not amount to decisions. If the court please, what I said is precisely the argument used by Judge Chalmers in *Whitehead* v. *Tucker.* He stated that the point was raised in that case, that the proponents and legatees were competent witnesses and that one of the strongest reasons for holding them competent was the fact that in a great many cases, both in England and America, eminent counsel had not thought enough of the objection to even raise it. That is the language of Judge Chalmers, not my language.

When one considers the positiveness with which Judge Mayes attempts to dispose of the six cases cited in my suggestion of error, and then considers the admission Judge Mayes is forced to make on page 27 of his reply, that in his original brief he was entirely mistaken in saying that "in *Kelly* v. *Miller,* Judge Chalmers made a complete miss," and that "recent study had convinced him that he erred in that," it would perhaps be sufficient to warn the court not to attach too much value to the "positiveness" of my good friend's "assertions." The truth is, that in *Jamison* v. *Jamison* and *Roberts* v. *Sivley,* and *Hitt* v. *Terry,* no such decision would ever have been rendered by this court, if it had deemed the objection here made in this case a good one. How it is possible for Judge Mayes to insist that *Tucker* v. *Whitehead,* 59 Miss. 594, is not a square decision as to the competency of Mrs. Kirk's testimony, it is simply impossible for me to understand. Judge Chalmers expressly so holds, stating the fact that the point was raised as to the testimony of the proponents and the legatees.

All that Judge Mayes says about "the mutilation of the will" has no force whatever to show that the other point was not expressly decided, as a mere reading of the case will show. The fact is, it is the learned counsel who "has made a complete miss," and not Judge Chalmers; it is the learned counsel who has made a "complete miss" about the *Covington case,* and not Judge Terral; it is learned counsel who still insists that this court "made a complete miss" in *Steen* v. *Kirkpatrick,* which we submit is a perfectly correct decision; and it is the learned counsel who completely misunderstands the case of *Watson* v. *Duncan,* 84 Miss. 763, and our exposition of it. He spends some three or four pages, actually, on the proposition that what we had to say about its being "a contract" in the *Duncan-Watson case* for the reason that if it was a contract, the "claim" vested *in praesenti,* that is, in the lifetime of the decedent; that

was the whole point made, and that was an absolutely vital point, because whatever "claim" did arise under that "antinuptial contract" did arise *in praesenti,* in the lifetime of the decedent.

It is amazing to me that so subtle a mind as learned counsel has "missed the whole point" made by me on that case, but it is idle to multiply words. It is perfectly manifest, for the learned counsel, with all his ingenuity, with all his subtle ability to mislead, by fanciful and false analogies, with all his resourcefulness, labors, and labors heavily throughout his reply, labors so heavily as to suggest a betrayal of the consciousness that his proposition cannot possibly be sound.

I am just going to sum up, in a very few lines, some thoughts, and submit this case without further wearying the court. If what has already been written in the original briefs in support of the suggestion of error is not sufficient to satisfy the court beyond all peradventure, that able and ingenious counsel misled the court by an utterly false analogy, then it is not in my power to add to the force of the presentation already made, on authority and on principle.

First. Learned counsel spent almost his whole strength, in his original brief, in this case, endeavoring to enlarge the word "claim" and give it a wider scope than any decision has ever yet given it, a scope, indeed, in the very face of every decision we have in this state on the subject, in the face of the universal understanding of the true construction of the word "claim" and the phrase "originated in the lifetime of the decedent;" and yet, if the word "claim" is to have the wide meaning he would give it, and Mrs. Kirk did have a claim which originated in the lifetime of decedent, it is perfectly obvious, as pointed out by Judge Campbell, that she could have assigned that claim to anybody, and then taken the stand and testified for the assignee, who could have recovered on her testimony. This is simply absurd.

Second. As also pointed out by Judge Campbell in his unanswerable way, the statute does not forbid the transfer of a claim except after death; consequently, if counsel's contention is true, and Mrs. Kirk had a claim within the meaning of the statute, as stated above, she could have assigned it while he lived, and the assignment would have been valid and her testimony competent to support it. Did anybody ever pretend that this is the correct view?

Third. Counsel staggers helplessly away from the proposition in Judge Campbell's original brief in support of the suggestion of error to the effect that the only claim this statute means is a complete and consumate claim, one Mrs. Kirk could have assigned if she had chosen, one which, if she had died intestate, would have descended to her heirs. The reasoning of counsel in his attempted reply to this proposition is hopelessly weak, for the obvious reason that there is no answer possible to be made to it.

Fourth. It is learned counsel who again "makes a complete miss" in saying that he stressed in his original brief the proposition that the vital thing here was the phrase "originated in the lifetime of decedent." I most respectfully beg learned counsel's pardon, it is a complete mistake to say that he stressed that proposition. He spent his whole force in enlarging the meaning of the word "claim." He glided very obscurely over the phrase "originated in the lifetime of decedent." I pressed that phrase, I stressed that proposition, and now, when the logic of Judge Campbell explodes the fallacy of his brief, he says that he argued it out in his first brief. I read his brief carefully, and the impression I got from his brief was that what he was trying to do was to give a definition of the word "claim" large enough to embrace what he says Mrs. Kirk's claim is, when in truth all that counsel's argument amounts to is to confuse a "claim" with the effect of the evidence in support of it.

Fifth and finally, it does seem to me, with all deference for my good friend, for whom I have the greatest admiration, that his attempted reply to the briefs in support of the suggestion of error, falls completely down, that it does not amount to an answer at all; that it is merely an ingenious, refined, and subtle line of reasoning without any support either of authority or of principle.

I submit that if the court shall recede from the second proposition, and hold this objection not well taken, all the supposed conflict suggested by my learned friend in regard to the previous decisions of this court, will disappear instantly, and the decision of this court on this subject will be in perfect harmony with the previous decisions; but if the court should still sustain this objection, it will, practically and necessarily, overrule six previous well settled decisions of this court on this subject.

Argued orally by *D. H. Barnett* and *Edward Mayes* for appellants and *T. H. Campbell* and *A. H. Whitfield* for appellee.

Cook, J. delivered the opinion of the court.

W. J. Kirk died on the 30th day of November, 1911, childless, leaving his widow, L. G. Kirk, appellee here, his sole heir at law. On the 25th day of February, 1909, the deceased made a will devising all of his property to his three sisters, who are the appellants in this case. When this will was offered for probate, Mrs. Kirk, the widow, filed a caveat, protesting against the probate of the will because same was not executed in the manner and form required by law, because at the date of the will testator was not of sound mind and body, and was not capable of making a will, and because the execution of the will was obtained by undue influence of the beneficiaries thereof. An issue *devisavit vel non* was made up, and a jury impaneled to try the issue returned a verdict in favor of the contestant.

At the trial, all of the grounds of contest seem to have been abandoned, save the one involving the testamentary capacity of the testator. The testimony of Mrs. Kirk, the wife of testator, formed a very material part of the evidence to establish the insanity of her deceased husband, all of which was objected to by appellants, upon two grounds, viz.: First. Because the wife was incompetent to testify concerning the acts and words of her husband, done and said under the protection of confidential communication between husband and wife. Second. Because the testimony of the wife was to establish her own claim to the estate of the deceased, which originated during the lifetime of the deceased.

The testimony of Mrs. Kirk recited in full the most intimate relations between herself and her deceased husband from their marriage to his death. She told about his habit of drinking and intoxication, his hearing of voices and communications with the spirits of the dead, his mutterings and outcries while asleep, the delusions which caused him to arm himself with guns and pistols, backed up by a bottle of whisky to supply courage, insults offered her, and attempts to take her life. True, it appears that he had been guilty of similar conduct at other times in the presence of others. This conduct and declarations in the presence of others it is competent for her to relate; but this does not authorize or permit her to testify about similar conduct and declarations made to her alone.

We think the major part of Mrs. Kirk's testimony comes under the condemnation of the rule which prevents one spouse from testifying about the acts and words of the other, which acts or words were performed or uttered when they were alone and were therefore to be deemed confidential. This rule has been relaxed in many jurisdictions, and many arguments are advanced to buttress the exception allowed. With these exceptions as weapons, able and distinguished counsel have

laid siege to, assaulted, and pounded the rule, until it is a mere shadow of the original. We prefer to adhere to the old rule in all of its form and purity. We are unable to differentiate between acts and words—and cannot appreciate the distinction between words termed ''verbal acts'' and mere words used in the confidential relations between husband and wife.

The confession of adultery, or the charge of infidelity, made in the privacy and under the confidence of the marriage confessional, are both protected. It will not do to say that because the husband, in a moment of contrition, or apprehension of ultimate detection, confesses to his adulterous relations with another woman, that this removes the ban of confidence, because the very act confessed tends to destroy the marital relations.

Again, because a husband, in a moment of jealous rage or drunken frenzy, confronts the virtuous wife with a cowardly and unfounded charge of infidelity, and because this deadliest of all insults is a thousand times worse than a blow, we do not think the wife can go upon the witness stand and detail before a jury the revolting and shocking brutality of her jealous or drunken spouse. By the policy of the law, as we understand it, the door of confidence is closed to all prying eyes and eager ears, never to be opened by the husband or wife in a court, whose duty it is to uphold the rule founded upon the wisdom of time and experience.

When the husband and wife are alone, everything said and done is under the protection of the rule and the declarations and conduct of both are presumed to be confidential. That similar acts occur and similar words are used in the presence of others raises no presumption that the presumably confidential declarations and conduct have been thereby released, and that those things said and done in privacy then become public property. Of course, many things are said and done by husband or wife, which upon their face bear no semblance of

confidence; but ordinarily what a wife says to her husband alone is said because he is her husband, and because she can speak freely undisturbed by the possibility that he will repeat what she says. For this reason, we think, when communications between husband and wife can be reasonably construed as confidential, the rule of public policy applies, and no, matter what may happen in particular cases, the courts will not permit a disclosure.

Change does not always denote progress, and modern departures from ancient rules of law in response to the exigencies of particular cases frequently obliterate the wisest and safest rules designed for the protection of society. Modern practices and advanced ideas look with complaisance upon the spectacle of husband and wife worshiping different Gods and voting in the same booth for different candidates and different governmental policies. We confess to a preference for the old-fashioned ideal of the oneness of man and wife, and at the risk of being classed as "standpatters" we adopt as a sound policy, applicable to the wife as to the husband, the sentiment expressed in these words: "Therefore shall a man leave his father and his mother, and shall cleave unto his wife; and they shall be one flesh." True, this admonition is hoary with age; but we doubt that the cock-suredness of modern iconoclasm has succeeded in demonstrating the unwisdom of the common paternal ancestor of all mankind. The majority still believe in the doctrine, even though few obey it.

There is an irreconcilable conflict in the authorities upon the precise point involved in this case. In *Stein* v. *Bowman,* 13 Pet. 209, 10 L. Ed. 129, it is said: "The rule which protects domestic relations from exposure rests upon considerations of the peace of families, and it is conceived that the principle does not merely afford protection to the husband or wife, which they are at liberty to invoke or not, at their discretion; but it renders

them incompetent to disclose facts in evidence in violation of the rule.  And it is well that the principle does not rest on the discretion of the parties.  If it did, in most instances, it would afford no substantial protection to persons uninstructed in their rights, and thrown off of their guard and embarrassed by searching interrogatories. . . .   Can the wife, under such circumstances, voluntarily or by compulsion, be required or permitted to disclose facts which render infamous the character of her husband?  We think most clearly not.  Public policy and established principles forbid it.''

In *State* v. *Jolly,* 20 N. C. 108, 32 Am. Dec. 656, the court, in commenting upon what acts and conduct are within the privilege as verbal communications, said: ''But it is not enough to throw protection over communications made in the spirit of confidence.  The intimacy of the marriage union enables each to be daily and almost constantly witness of the conduct of the other; and thus in fact a confidence, reaching much farther than that of verbal communication, is forced upon each of the parties.  What one may even desire to conceal from all human eyes and ears  is thus almost unavoidably brought within the observation of the other. . . .   The rule we deem a valuable one, and we view with apprehension any exception having a tendency, more or less direct, to promote cunning, or to generate distrust, where the best interests of society require that perfect frankness and confidence ought to prevail.  If one exception be sanctioned, because, from the character of the criminal act imputed, the dissent of the witness from its commission must be presumed, others may follow, where the like presumption will be entertained, . . .  and there will be danger of our having no rule capable of general and steady application. . . .   Moreover, the rule is not founded exclusively upon an actual voluntary confidence reposed by one of the married pair in the other, but also upon the unavoidable confidence which the intimacy of

the marriage state necessarily produces.'' See, also, *Owen* v. *State,* 78 Ala. 425, 56 Am. Rep. 40; *Boykin* v. *Boykin,* 70 N. C. 262, 16 Am. Rep. 776; *Hanselman* v. *Dovel,* 102 Mich. 505, 60 N. W. 978, 47 Am. St. Rep. 557; *Brewer* v. *Ferguson,* 11 Humph. (Tenn.) 568; *Wickes* v. *Walton,* 228 Ill. 56, 81 N. E. 798; *Hertrich* v. *Hertrich,* 114 Iowa, 643, 87 N. W. 689, 89 Am. St. Rep. 389; *Monroe* v. *Twistleton,* Peakes Add. Cases, 219; *Doker* v. *Hasler,* 21 E. C. L. 732; *O'Connor* v. *Marjoribanks,* 43 E. C. L. 228.

In *Schreffler* v. *Chase,* 245 Ill. 395, 92 N. E. 272, 137 Am. St. Rep. 330, a case treating testimony much like the testimony delivered by Mrs. Kirk in this case, it is held that the divorced husband was incompetent to testify to the conduct of the testatrix, as observed by him from the time he married up to the time of the separation.

The other point relied upon for a reversal invokes a broader rule to exclude the testimony of Mrs. Kirk. It is insisted that she was incompetent to testify at all ''to establish his [her] own or assigned claim . . . against the estate of a deceased person.'' Section 1917, Revised Code of 1906. This section of the Code has been the law of the state since 1857, or longer. The language of the various statutes embodying the rule varies somewhat, but they are all to the same effect. Many times this court has construed this statute, and it is difficult to entirely harmonize the decisions. Able counsel for appellants in their briefs collate and critically analyze all the cases. We have examined the cases with care, and find ourselves unable to improve upon the work of counsel, and will therefore make use of their work by quoting liberally therefrom.

Before proceeding further, we now state the question, viz.: Did Mrs. Kirk testify to establish her claim against the estate of deceased, which claim originated during the lifetime of deceased? To answer this question, we come now to a consideration of the decisions of this court:

*Griffin* v. *Lower,* 37 Miss. 458, was a suit by an administrator to recover on a note payable to him as such. Defendant offered to defend, by testifying about transactions with deceased in his lifetime, constituting the consideration for the note. Testimony excluded.

*Kelly* v. *Miller,* 39 Miss. 17, was a case in which an executor and devisee was admitted to testify in support of the will. The whole question was whether article 45, p. 434, Code 1857, which made void a devise to a subscribing witness, resulted in making such witness incompetent to testify in support of the will.

*Lamar* v. *Williams,* 39 Miss. 342, was a suit to recover damages for battery to a slave. Defendants offered to testify that the owner, since deceased, consented. Evidence excluded, and the court gave a broad meaning to the word "claim," and said that the statute intended to prohibit the "undue advantage" of allowing a living party to "testify to matters which took place between him and the deceased, and which resting entirely in the private transactions of the parties, could not be disproved or explained by reason of the death of the other party."

*Witherspoon* v. *Blewett,* 47 Miss. 570, contains a full and strong statement of the court's policy in construing the statute. It was said that "the interpretation put upon the statute is broader than its words, but was demanded by its reason and intendment."

*Jacks* v. *Bridewell,* 51 Miss. 887, contains a full and strong review and assertion of the policy and meaning of the statute. The statute extends to every assertion of right to any part of the estate left by a deceased party, by testimony about dealings with such party in his lifetime.

In *Rothschild* v. *Hatch,* 54 Miss. 554, A. L. Hatch, plaintiff in ejectment against the heirs of one Griffith, deceased, was held incompetent to testify about certain statements made by deceased in his lifetime as to the

104 Miss. 52

nature of his holding of the lands in controversy. In this case it was held that an assignment of the claim restored the competency of the party; whereupon the Legislature promptly passed Acts 1878, page 190, extending the exclusion to one who had assigned.

In *Tucker* v. *Whitehead*, 59 Miss. 594, it was held that the proponent and contestant were both competent to testify, nothwithstanding the statute, and *Kelly* v. *Miller*, *supra*, was cited. But this case was as follows: In deceased's papers was found a will, with the signature torn off. In such case, the law presumes that this was done by the testator, and done *animo revocandi.* (See authorities cited by Mr. Leigh.) The real claim and issue on this issue of *devisavit vel non* was this, and only this: A question of fact, whether after the death a brother of the deceased got hold of the will and mutilated it. That was the sole question actually brought before the jury as is shown by the statement of the case; and it was about that that the parties were in fact held competent to testify.

*Neblett* v. *Neblett*, 70 Miss. 572, 12 South. 598, was a controversy between two sets of devisees; the devises having been made in general terms, and the questions turning on the titles of the devisors. Stirling Neblett, Sr., conveyed to his two sons, W. J. Neblett and Stirling Neblett, Jr., in 1857. The father died in 1871, devising his estate to his wife, Ann Neblett. Stirling Neblett, Jr., one of the two donees by the deed above mentioned, died in 1877; his mother being still living. The mother, Ann Neblett, then died in 1881. Then W. J. Neblett, the other donee by the deed above mentioned, died in 1891, 10 years after the death of Ann. Bill was filed by the devisees of Ann Neblett, who died in 1881, against the devisees of Stirling Neblett, Jr., who died in 1877, and against the devisees of W. J. Neblett, who died in 1891, to vacate the deed of 1857. Complainants testified in their own behalf, but it was held that they were incompetent under

the statute; their testimony going to show that after the making of the deed of 1857, until his death in 1871, Stirling Neblett, Sr., had retained possession of the lands, etc., and declarations and admissions by the deceased donees.

In *Covington* v. *Frank*, 77 Miss. 606, 27 South. 1000, Frank filed his bill against the unknown heirs of Covington, deceased, to collect certain notes executed by Covington alone. Covington's widow and daughter made appearance, interposed defense, etc., and testified to prove their relationship. Frank's bill was filed against the "unknown heirs" of Covington, and the depositions of the widow and daughter were strictly responsive, and only proved their identity as being those heirs, whom the complainant had called into court by the general terms of his bill. In that action they were not pursuing the estate for anything, and no decree rendered in their favor could have established any right in them as against any representative or heir of the estate. On the other hand, they were not testifying defensively, within the meaning of the statute, because they were not being pursued in behalf of the estate of any person whatever. It was simply one instance of the well-recognized class of cases (of which there are numerous other instances in the decisions on this statute) where the testimony would only remotely or collaterally claim an interest, which would have to be vindicated or asserted effectually in some other suit or proceeding, if asserted at all. See note to *Townsend* v. *Kennard,* 1 Miss. Dec. 222, 224.

In *Steen* v. *Kirkpatrick,* 84 Miss. 63, 36 South. 140, T. J. Steen and his wife had an antenuptial agreement that if one should die the survivor should take interest in the deceased's estate for life only, and that at the death of the survivor such interest should revert to the estate of the first decedent. Under this agreement, when Steen died, his wife received seventeen hundred and fifty dol-

lars as her share of his estate, and while she lived fully recognized that on her own death this money was to be property of her husband's estate. She did die; and a son of Steen (by a former marriage), in behalf of himself and his brothers of the whole blood, undertook to probate this claim against the estate of his stepmother. This probate was contested by the children of Mrs. Steen by her first marriage. In this state of the case it was held that W. T. Steen could testify. The decision was expressly put on the ground that "this claim is a controversy between the two sets of children, and did not originate during the lifetime of the decedent, Mrs. Steen."

In *Watson* v. *Duncan,* 84 Miss. 763, 37 South. 125 Duncan, surviving his wife, renounced her will and elected to take under the law. His right to renounce was denied, and a prenuptial contract set up against him. He undertook to testify that the important clause in that contract was a forgery.

We think the points before the court in the several cases are fairly stated, and it will be observed that this court seems to have employed language and decided cases which can be construed to be on either side of this controversy. If Mrs. Kirk is competent to testify, her testimony will have the effect to destroy the will of her husband. Her evidence relates to the conduct and declarations of the deceased, and tends to prove that he was not mentally capable to make a will. If this incapacity is established, she would inherit all of his property, and her title to same was absolutely fixed and irrevocable, provided only she survived her incurably afflicted spouse. The effect of Mrs. Kirk's testimony is to make it impossible for any act of Mr. Kirk to deprive her of a sure title to his estate, no matter what may be the equities of the case. If she could succeed in convincing a jury that her husband was incurably insane at and before the execution of his will, her status is conclusively fixed.

Nobody would contend that she was competent to testify that Mr. Kirk conveyed his property to her before

his death, and that the deed of conveyance was properly acknowledged before an officer now dead, and that the deed was lost or destroyed. If she could establish such conveyance, it would follow that Mr. Kirk did not own any property, and that his will conveyed nothing to his devisees. If she can establish his insanity, the same result is reached, and her claim to his property originated before his death, and this inchoate claim would become a complete title, should she survive him. As a matter of fact, she is not testifying about an inchoate right, but about a right already ripened into a sure thing. She related to the jury the conduct and declarations of the dead, which testimony has established his insanity; and the insanity establishes her claim to his estate, and this claim is established by the acts and conduct of deceased, and it logically follows that her claim not only began or originated in the lifetime of the deceased, but was established then so far as the deceased was concerned. According to Mrs. Kirk's testimony, his power to change her inchoate claim was abrogated by something originating in his lifetime, and death alone could rob her of her claim to his estate. This status, alleged to have originated during the lifetime of the husband, is the thing to be established by the testimony of the wife; and, when thus established, her claim to the estate is established, originating when the husband lost his mind, but not coming into full flower until his death.

The policy of the statute is to close the mouth of the living, because death has sealed the lips of the dead. In the instant case the husband cannot speak in defense of his right to dispose of one-half of his estate by will; and, if the policy of the law means anything, the living should not be permitted to establish a state of facts which the defendant cannot now deny, when, as here, the living wife absolutely fixes her claim to that portion of the estate. We think counsel for appellants in their brief thus accurately state the rule to be followed in deter-

mining whether or not the evidence offered should be admitted:

"Whenever a witness is offered for the purpose of proving any transaction, act, contract, admission, license, condition, etc. (whatever may be its exact nature), as 'a fact to be proven,' and proven as a fact existing or occurring prior to the death, and the proof of such fact as then existing or occurring is determinative of a claim or right of such witness to or in property of the deceased, and establishes such claim or right directly and finally there the witness is testifying to establish his claim which originated during the lifetime of such deceased. In short, the word 'claim,' as used in this statute, is employed in a broad and general sense; and it draws into the prohibition all testimony, the direct, immediate, and final effect of which is to establish in the witness' own behalf a right in or to things prior to the death. The statute must be taken as dealing with an effectual claim—with a claim which means something, and is not a mere shadow. If the issue on the trial is such, in order for the claim to amount to anything, it is necessary to prove or disprove certain facts as existent or nonexistent before the death, then the claim originated before the death; for neither logically nor legally can the 'claim' be separated from what is necessary to make it effectual, or from anything that flows into it, becomes part of it, augments and increases it, and fixes, or contributes to fix, the scope of it."

We do not undertake to harmonize the decisions of this court construing section 1917 of the Code, but content ourselves with deciding that Mrs. Kirk's evidence was to establish her claim to the estate of her deceased husband, within the meaning of the statute. So it is we have concluded that the testimony of Mrs. Kirk, relating to confidential relations and conduct of her husband, should not have been permitted to go to the jury, because the rule forbidding husband and wife to give such evidence

is founded upon public policy, for the protection and conservation of the marital relations. We have further concluded that Mrs. Kirk is disqualified to testify in support of, or in aid of, her claim to the estate of her deceased husband about matters occurring within the lifetime of her husband.

*Reversed and remanded.*

OPINION ON SUGGESTION OF ERROR.

COOK, J. The original opinion in this case is reported in 61 South. 737. The reversal was based upon two errors of the trial court, to wit: (1) Because the wife of deceased was permitted to testify about the acts and words of her husband, done and said under the protection of confidential communication between husband and wife. (2) Because the testimony of the wife was to establish her own claim to the estate of the deceased, which originated during the lifetime of the deceased.

This case is again before the court on suggestion of error. It is claimed that the court erred in reversing the case at all; but, as only the ruling on the second ground is seriously and earnestly attacked, we will confine this opinion to that assignment of error. The briefs on file are the products of the brains of the most illustrious lawyers of the state, and every phase of this controversy has been threshed over with consummate skill and ability. Nothing has been left unsaid which could possibly throw any light upon the question. What we may say will therefore necessarily be a paraphrase or literal quotation from the briefs.

The dominant note of the arguments in support of the suggestion of error is that eminent lawyers have not heretofore raised the precise point here involved, and that the decision in this case is ''contrary to general professional understanding in this state.'' It is also contended that former decisions of this court are in conflict with

our decision of the present case; but no such decision has been cited, and it is believed that none can be found.

It may be admitted that the question here considered, by general professional understanding, has been settled adversely to the original opinion in this case, and yet the general understanding may be, and we think is, far from the truth. The writer was in the class who believed that the point had been so settled when a review of the question was begun by this court in this case; but a careful consideration of all the decisions of this court convinced us that this belief was not supported by the decided cases, and now, after re-examination of the cases, and after a thorough consideration of the very able briefs, we are more convinced that the assumed "general professional understanding" can find but little comfort in the reported cases. If such general understanding exists, it resulted from a misinterpretation of the decisions, and is unsound and destructive of the very spirit and purpose of the statute, which was intended to seal the lips of the living; death having sealed the lips of the dead. It comes about by a narrow construction of the word "claim," by which narrow construction the purpose of the law is nullified.

Mrs. Kirk's claim to the entire estate of her deceased husband, if it exists, is owing to, springs from, and originated in his insanity, and his insanity is hinged and turns upon his acts and words performed and spoken during his lifetime. Stated differently, if Mrs. Kirk can show that her husband was insane at, before, and after the time he executed the will, she having survived him, and he being childless, she will then have established her claim to his entire estate. By her testimony, she established his insanity—his insanity, of course, occurred during his lifetime—and the evidence to prove his insanity is composed of his acts and conversation; therefore it seems to logically follow that she testified about a claim, or right, which depended and turned upon, and which originated

because of, his insanity, and, when he became incurably insane, then it was her right, or claim, had its origin. The claim or right to enforce the payment of a debt against the *estate of a deceased person* does not originate until the person is dead, but the claim or right upon which the remedy is sought may have originated before or after the death. If it originated before the death, the person making the claim is not permitted to establish same by his own testimony; if it originated after the death, and in the course of the administration, such claimant may establish same by his own testimony.

"Before statutes on the subject, parties to suits were not competent witnesses in their own behalf. With the removal of the incompetency of parties as witnesses for themselves, there was excepted from the cases in which they might testify all in which a right is asserted against any part of the estate of a deceased person, no matter in whose hands it might be at the time of the controversy, and which 'right' rests upon something occurring in the lifetime of such deceased person, and having relation to him." *Jacks* v. *Bridewell,* 51 Miss. 881.

"Prior to the Code of 1857, it was competent for either party in a *justice's court* to prove his claim by his own oath, after making oath that he had no evidence to establish it, in his power to procure; and such was the law even in suits against decedents' estates. By article 18, p. 408, Code of 1857, this rule was changed, so as to admit either party in that court to prove his own claim or defense, without such preliminary affidavit, and so as to allow one party to require the other to testify. By article 190, page 510, of that Code, the common-law disability, because of interest, to testify, was removed; but in so doing the Legislature added the proviso 'that no person shall be a witness in any suit by or against himself, to establish his own claim to an amount exceeding fifty dollars, against the estate of a deceased person.' "

"*Griffin* v. *Lower,* 37 Miss. 458, explains all this legislation; and it is there adjudged that the object of the pro-

viso was to protect the estate of deceased persons against the operation of article 190, and at the same time to make no change in the practice observed in the justices' courts. Thus the proviso, in its very origin, was declared by this court to be restrictive, in the particular with which it deals, of the general policy in removing the common-law disability to testify."

*Lamar* v. *Williams,* 39 Miss. 342, decided in 1880, was trespass for flogging a slave; suit by administrator of the deceased owner. The defendant was offered in order to prove that the whipping was given in the lifetime of the owner and by his permission. This court said this: "It is insisted that the defendants were not debarred of the right of testifying by the proviso to article 190, page 510, Rev. Code, because that proviso applies only to 'claims' against a deceased person's estate, involved in a suit by or against the party offered as a witness, and that, the object of the defendants not being to establish any 'claim' against the estate of plaintiff's intestate, they were not within the proviso."

"We do not think the spirit of the statute justifies this position, or that the term 'claim' should receive this restricted construction. If it be interpreted on the mere sense of a fixed debt against an estate, such as is contemplated by the statute in relation to the probate of 'claims' against a decedent's estate—as is contended in behalf of the plaintiffs in error—a plaintiff in any action ex delicto against the estate of a decedent, the cause of which had accrued in his lifetime, or for the recovery of a specific chattel, would have the right to testify in his own behalf; and any defendant, sued by the representatives of a decedent for a cause of action which accrued in the decedent's lifetime, would be authorized to testify to anything which would avoid the demand, such as payment to the decedent, set-off, *non est factum,* and the like, because that would not be to set up any 'claim' against the estate. But this is clearly in contravention

of the policy of the statute as it has been recognized by us in the case of *Griffin* v. *Lower,* 37 Miss. 458. The spirit and policy of the proviso appears clearly to be that a living party, either plaintiff or defendant, in an action in which the representatives of a decedent's estate are a party, shall not be competent to testify in his own behalf to establish his demand or right, asserted and relied on in the action against the estate, if the matter exceed the sum of fifty dollars, because an undue advantage would thereby be given to the living party, by enabling him to testify to matters which took place between him and the decedent, and which, resting entirely in the private transactions of the parties, could not be disproved or explained by reason of the death of the other party."

After this decision, we find the Legislature of the state, in Code 1871, section 758, adopted the following statute: "No person shall testify as a witness to establish his own claim of any amount, for or against the estate of a deceased person, which originated during the lifetime of such deceased person. But such person so interested shall be permitted to give evidence in support of his demand against the estate of a deceased person which originated after the death of such deceased person, in the course of administering the estate." It will be observed that the legislature by this statute progressed by providing that no person could testify in support of his claim against the estate of a deceased person for any amount and providing further that a party interested might testify, and the permission is given in such case only "in support of his demand against the estate of a deceased person which originated after the death of such deceased person, in the course of administering the estate."

In *Witherspoon* v. *Blewett,* 47 Miss. 570, decided in 1873, the court, construing section 758 of the Code of 1871, said this: "The manifest reason for the exclusion

of such witness is to shut out ex parte evidence touching matters and transactions which transpired in the lifetime of the deceased, after death has sealed the lips of one of the parties, so that his version and explanations and statements cannot be heard. It was, too, to prevent the establishment of false and simulated claims, by such *ex parte* and interested testimony, against estates.''

''But does the reason and spirit of the proviso to the section apply where the facts to which the witness testifies arose after the intestate's death, touching, too, a cause of action which had its inception posterior to his death? The interpretation put upon the statute is broader than its words, but was demanded by its reason and intendment. This much is plain: If the suit be for a tort or a contract done or made in the lifetime of the intestate, the survivor is incompetent to prove the one or the other against the estate; so, if he is sought to be charged by the administrator with either, he cannot testify in his discharge. . . . Following in the line of the liberal exposition which has been given to the statute, we have been brought to the conclusion that, when no cause of action existed in the lifetime of the deceased, but originated afterwards, either for or against the estate, the parties to the suit are competent witnesses as to those matters which originated after the intestate's death. In order to quiet doubts on this point, Code 1871, section 758, allows such interested person to testify 'in support of a demand against an estate, which originated after the death of such deceased person, in the course of administering the estate. This, because the administrator or executor may be supposed to be conversant with such demands; and the reason for the exclusion, where the cause of action existed in intestate's lifetime, has no force.' ''

Afterwards, in 1876, *Jacks* v. *Bridewell, supra,* was decided by this court, and in the course of this decision, the following language is employed: ''The object is to pre-

vent the assertion of rights to what a deceased person
left, by virtue of some act of such deceased person from
being supported by the testimony of him who asserts the
right. . . . When death has placed the evidence of
one of the parties to the transaction, out of which the
claim arises, beyond the pale of the court, the statute
enacts that the other shall not be heard, for or against
such claim. As to that transaction, both of the parties
thereto are dead—one through natural causes, the other
by legislative enactment.''

In reply to the argument of counsel in support of the
suggestion of error, we quote from the brief of counsel
for appellants, because we believe the same to be a com-
plete and satisfactory answer to the position of appel-
lee in this case:

''The vice in the whole argument is that it assumes
as a definition of the word 'claim,' as that word is
employed in the statute, a restriction of meaning which is
incorrect, and is directly in the teeth of the purpose and
meaning of the word and of the statute, as announced
in several cases, and recognized for fifty years past. The
expression is not to be confined in its application to such
claims or demands as import an assertion of a direct
legal liability of the decedent to the claimant, or of a
present title of the claimant in or to decedent's estate, or
some part thereof. The very first case, but one, *Lamar
v. Williams,* 39 Miss. 342, cited above, settled that. The
claim successfully asserted there was merely defensive
against an action of tort, a license given by the decedent
in his lifetime; and the court denied that the word 'claim'
should receive the restricted construction, or be inter-
preted in the mere sense of a fixed debt, or of a demand
*ex contractu.* The court enlarges on the spirit of the
statute, and points how a demand and a right are differ-
ent, and that there are different sorts of rights. In view
of this decision, what possible force can there be in the
suggestion that Mrs. Kirk's claim was not such a one as

she could assign or as would descend to her heirs? None
whatever. . . . Opposite counsel not only place too
restricted an interpretation on the word 'claim,' and one
wholly unauthorized, but also too restricted an inter-
pretation on the other expression used in the statute,
'which originated during the lifetime of such deceased
person.' He argues throughout (it constitutes the back-
bone of his whole suggestion) as if the word 'originated'
imported the notion of consummation of title, or vestiture
of right, prior to the death. He says the claim contem-
plated by the statute must be 'complete' or 'perfect' be-
fore the death—all the expressions employed by him con-
veying the meaning that the claim asserted must be one
about some sort of a vested interest; and then he asserts
that Mrs. Kirk's interest was not such, but only sprung
into existence *eo instante,* on the death, etc. It is too nar-
row a view, and also is not authorized either by the origi-
nal lexicographical use of the word 'originated,' or by
its special judicial and legislative history in this con-
nection.''

We have referred to all the cases relied upon in this
suggestion of error in the original opinion, and endeav-
ored to point out just what was decided by those cases,
except the three cases now cited for the first time, to wit,
*Jamison* v. *Jamison,* 92 Miss. 468, 46 South. 83, 945, *Siv-
ley* v. *Roberts,* 53 South. 595, and *Hitt* v. *Terry,* 92 Miss.
671, 46 South. 899. We do not think that either of the
last three named cases are of any value here, for the
simple reason that the point involved in this controversy
was not raised in those cases, either in the lower court
or in the supreme court; and, for that reason, it is mani-
fest that the decision of those cases did not rest upon the
point in controversy in this case. Why the point was not
raised and relied upon in those cases is not for us to say.
The point was not raised and if not raised, it seems clear
to us that this court was not called upon to raise the
point itself; and, in fact, the court in neither of those

cases did discuss or refer to the point now being discussed.

Six cases are cited, all of which it is said "do discuss and do decide the precise question." We will now borrow the analysis of these cases from the brief of counsel for appellants. Learned counsel, speaking of the assertion that these cases do discuss and do decide the precise question, has this to say: "If they do *not,* then *we* say that counsel will have 'struck out.'"

Of *Tucker* v. *Whitehead,* 59 Miss. 594 (the first case adduced), counsel for appellants say: "There was no question whatever about the testator's capacity, none about the original execution of the will. The specific and only question to be tried was this: Whether after the death the document had or had not been mutilated. Judge Chalmers himself so says, on pages 604, 605: 'The deceased was a bachelor, and his brother, Thomas M. Tucker, was known to have had free access to his papers during the period intervening between his death and the finding of the mutilated will. The niece, believing that the mutilation had occurred after death, and by the hand of a spoliator, offered the will for probate, and upon proof satisfactory to the clerk and the chancellor it was duly admitted to probate in common form in the chancery court of Clay county. Subsequently a portion of the heirs at law, including the brother towards whom suspicion pointed as the mutilator of the document, instituted this proceeding for an issue of *devisavit vel non.'*" Counsel then proceeds: "The very opinion of the court shows, therefore, that it was, in fact, a controversy over what occurred after the death. That was the point in issue; the determinative fact. No witness was offered for the purpose of proving (like Mrs. Kirk) any act, fact, condition, or status existing prior to the death as determinative of the right claimed by such witness."

Of *Covington* v. *Frank,* 77 Miss. 606, 27 South. 1000 (the second case adduced), counsel say: "This case was

analyzed by us, and its inapplicability pointed out, in our original brief. We then and there pointed out that it was decided correctly, but a wrong reason was given; it is good in its class, but no authority whatever in this case, because this case is not of that class. It did not determine anything whatever as between witnesses and the estate. The record made could never have been used for any such purpose; it was collateral, within the settled line of decisions which began with *Faler* v. *Gordon,* 44 Miss. 283. The bill in that case had been filed by creditors to enforce a mortgage against the 'unknown heirs,' etc., and Mary Covington and Cornelia Miller had come in as such heirs to defend that bill. They were not establishing their claim against the estate, but only establishing their right to defend that suit. The record in that suit could not possibly have been used against the estate for the purpose of establishing any claim of theirs against the estate. This court decided the case with manifest correctness; but Judge Terral gave a clearly wrong reason, and that is all about it. The wrong reason, is not decision.'' Judge Terral in that case said this: ''The claim directly in issue here is the claim of these executors; the right of Mary Covington and Cornelia Miller is only indirectly concerned.''

*Steen* v. *Kirkpatrick,* 84 Miss. 63, 36 South. 140, is thus treated: ''T. J. Steen and his wife had an antenuptial agreement that if one should die the survivor should take the interest in the deceased's estate for life only, and that at the death of the survivor such interest should revert to the estate of the first decedent. Under this agreement, when Steen died, his wife received one thousand seven hundred and fifty dollars as her share of his estate, and while she lived she fully recognized that on her own death this money was to be property of her husband's estate. She did die; and a son of Steen's (by a former marriage), in behalf of himself and his brethren of the whole blood, undertook to probate this claim against the

estate of his stepmother.  This probate was contested by
the children of Mrs. Steen by her first marriage.  In this
state of the case it was held that W. T. Steen could testi-
fy.  The decision was expressly put on the ground that
'this claim is a controversy between the two sets of
children, and did not originate during the lifetime of the
decedent, Mrs. Steen.'  This case is clearly a wrong de-
cision, and should be overruled.  The learned judge who
delivered the opinion of the court fell into the error of
treating the word 'claim,' used in the statute, as if it
were synonymous with the word 'controversy,' and
weighed the statute, and limited its application, as if it
had run thus:  'A person shall not testify as a witness
to establish his own claim against the estate of a de-
ceased person in a controversy which originated during
the lifetime of such deceased person.'  But such is not
the statute.  It makes no difference when the contro-
versy arises; but, if the death must be established by
proof of facts prior to the death, then the claimant can-
not testify.  That is clear, simple, sane, and safe.  Coun-
sel now insist upon that decision.  We have a right to ex-
pect that in their suggestion they should answer our crit-
icism of the case; they have not even attempted to do so.
Until they do, we stand upon that criticism and reaffirm
it.  And we reaffirm the proposition, made in our origi-
nal brief (page 28) that *Watson* v. *Duncan,* 84 Miss. 763,
37 South. 125, showed the true rule, and in effect over-
ruled *Steen* v. *Kirkpatrick.*  In their original printed
brief (not in this suggestion of error) counsel under-
take on page 43 to refute that proposition, but in the ef-
fort practically show that we were and are right, so fa-
tally does their argument halt.  First, they expressly ad-
mit that 'Duncan's testimony was manifestly incompe-
tent'; also that by this court 'his incompetency was
treated as a matter of course, as counsel remarked.'  So
far we have made progress.  Secondly, why was his tes-
timony incompetent and so treated by the court?  Coun-

104 Miss. 53

sel say, at first, because it was 'testimony that an important clause in the will was a forgery,' which is erroneous, as their own statement shows later; it was a clause in the antenuptial contract which was the forgery; it was, then, Duncan's attempt to prove such forgery in the antenuptial contract which made him incompetent. Thirdly, the attitude of the parties as to the 'claim' asserted was this: Duncan, a childless widow, was asserting his right as statutory heir, he having renounced the will to one-half her estate; Mrs. Kirk, a childless widow, was asserting her right as statutory heir, as in case of intestacy, to the whole estate; in each instance the right asserted was of inheritance, eo instante the death, by statute. Fourthly, in the *Duncan Case* the devisees under the renounced will set up against his renunciation and claim, by way of defense, an antenuptial contract which contained a stipulation that the decedent might will her property as she might want to any persons, which stipulation Duncan offers to prove, by his own testimony as to matters before the death, was a forgery; while in this case the legatees under Kirk's will set up against Mrs. Kirk's claim, by way of defense, a will to themselves, which will Mrs. Kirk offers to prove, by her own testimony as to matters before the death, was a nullity for want of testamentary capacity.''

Speaking of *Kelly* v. *Miller,* 39 Miss. 17, counsel say that this case ''does not bear on this question at all; that the whole question there considered and decided was whether article 45, page 434, Code 1857, which made void a devise to a subscribing witness, resulted in making such witness incompetent to testify in support of the will. This interpretation of the case is not ours. Judge Harris delivered the opinion of the court, and he said this: 'The only error in law assigned, so far as we are able to ascertain from the arguments of counsel (no assignment of errors appearing among the papers submitted to us), is that the testimony of Miller—the devisee,

legatee, and executor under the will—was allowed over
the objections of appellant.' On this point it is urged
that, inasmuch as by our Code (page 434, art. 45) a de-
vise or bequest to a subscribing witness is void, he is in-
competent to testify when called to support a will in his
favor. There is certainly no force in this objection. The
article relied on does not make even a subscribing wit-
ness incompetent to testify, but removes his interest by
declaring the devise or bequest, under such circum-
stances, void as to him.''

Ordinarily we would not go over a former decision
to the extent we have in this case; but the importance of
our decision is fully realized, and the earnest insistence
of counsel (whose reputations as learned jurists are
written in the judicial history of the state) that we went
wrong in the original opinion seems to demand a some-
what lengthy restatement of our interpretation of  the
decisions of this court upon the question before us. The
reply brief of the great lawyer representing appellants,,
in our opinion, is a demonstration of the correctness of
our original conclusions, and from this brief is drawn
the major part of this opinion.

The decisions of other courts, upon different stat-
utes, it is believed, do not aid in the solution of this con-
troversy. In our original investigations, it was discov-
ered that our statute is radically different from the stat-
utes of all other states which we could find. The stat-
utes of the several states are analyzed in Encyclopedia
of Evidence.

*Suggestion overruled.*